# FOR PUBLICATION



**FILED**

Jul 24 2013, 6:27 am

**CLERK**
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW J. MCGOVERN**
Anderson, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| CYNTHIA SUGG, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 31A05-1208-CR-397 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE HARRISON SUPERIOR COURT
The Honorable Roger D. Davis, Judge
Cause No. 31D01-1202-FB-119

**July 24, 2013**

**OPINION - FOR PUBLICATION**

**KIRSCH, Judge**

Cynthia Sugg ("Sugg") was convicted after a jury trial of dealing in methamphetamine[1] as a Class B felony, maintaining a common nuisance[2] as a Class D felony, possession of methamphetamine[3] as a Class D felony, possession of chemical precursors[4] as a Class D felony, possession of marijuana[5] as a Class A misdemeanor, and possession of paraphernalia[6] as a Class A misdemeanor and was sentenced to an aggregate term of ten years. She appeals, raising the following consolidated and restated issue for our review: whether the trial court abused its discretion when it admitted evidence seized under the search warrant at trial because the evidence was discovered in violation of the Fourth Amendment to the United States Constitution and Article I, section 11 of the Indiana Constitution.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In 2012, Sugg and her husband, Gary Wynn ("Wynn"), lived in a rented farm house that was located in a rural area in Harrison County, Indiana. Steven Probus ("Probus") was their neighbor and rented a cabin adjacent to their home. Probus was friends with Sugg and Wynn, and they visited each other often. On February 16, 2012,

---

[1] *See* Ind. Code § 35-48-4-1.1.

[2] *See* Ind. Code § 35-48-4-13.

[3] *See* Ind. Code § 35-48-4-6.1.

[4] *See* Ind. Code § 35-48-4-14.5.

[5] *See* Ind. Code § 35-48-4-11.

[6] *See* Ind. Code § 35-48-4-8.3.

Sugg and Wynn each purchased a forty-eight count box of pseudoephedrine pills from the same Walgreen's store in New Albany, Indiana within five minutes of each other. That night, Probus smoked methamphetamine with Sugg at her home.

On February 17, 2012, Indiana State Police Detective Katrina Smith ("Detective Smith"), with the methamphetamine suppression unit, obtained information from the National Pseudoephedrine Log Exchange ("NPLEx") that Suggs and Wynn had made the pseudoephedrine purchases the previous day. When she saw these transactions, she remembered her participation in a prior investigation in June 2011, where Sugg and Wynn had been charged with manufacturing methamphetamine. Detective Smith and her supervisor, Sergeant Paul Andry ("Sergeant Andry") decided to conduct a "knock and talk" at Sugg's residence based on this information. *Tr.* at 81.

That morning, Sugg had been outside painting a camper when Probus walked over to visit. The two went inside to smoke a marijuana joint in the living room. As Probus left the back door to walk home, Detective Smith, Sergeant Andry, and a third trooper approached the front of the residence. Probus told the troopers that he had knocked, but no one had answered. The troopers' approach to the front door was blocked by decorations and various items, so Detective Smith and Sergeant Andry walked around to the back door, while the third trooper stayed and talked with Probus.

Sugg was standing on the back porch in socks and no shoes and with no jacket. It was a sunny, chilly day, but a warmer than usual day for February. Detective Smith identified herself and told Suggs that the troopers were there investigating drug activity and, specifically, methamphetamine manufacturing. Detective Smith observed a gallon

3

of muriatic acid sitting on the back porch and a bottle of charcoal lighter fluid sitting underneath a propane gas grill, both of which are precursors to manufacture methamphetamine.

Detective Smith asked Sugg about her recent pseudoephedrine purchase. Sugg said that she could not remember when she made her last purchase, but that it had been awhile. When Detective Smith refreshed her memory that it had been that week, Sugg claimed it had been a couple of days prior, at the beginning of the week. Detective Smith then asked Sugg how many pills she took per day, and Sugg told her four or five and that she had taken all of them already. Detective Smith then confronted Sugg with the belief that she had purchased forty-eight pills the day before, and Sugg was still not able to produce any of the pills. Sugg also claimed to not know when Wynn purchased pseudoephedrine pills and that he did not make a purchase when she did.

At that point, Detective Smith asked Sugg if they could search her residence. Sugg asked to call Wynn to talk to him, which she was allowed to do. After her phone call to Wynn, Sugg refused consent to search her residence. Detective Smith told Sugg that she was going to petition for a search warrant. Because obtaining a search warrant could take some time, and Sugg was not wearing a coat or shoes, Detective Smith told Sugg that she could go into the house to retrieve any personal items, but that she would need to be escorted by an officer to prevent the destruction of evidence or the chance to obtain a weapon. Because Sugg "was cold and really needed a cigarette," she agreed. *Tr.* at 129.

4

As soon as she was inside the residence, Detective Smith detected the odor of burnt marijuana. While Sugg retrieved a few items, she made small talk about a chocolate bar she had enjoyed as a kid that she had recently been able to find. Sugg showed Detective Smith the candy bar, which was located on the living room table. When the detective looked at it, she noticed stems and seeds consistent with marijuana in an ashtray on the table.

Detective Smith and Sugg exited the house, and Detective Smith left to obtain the search warrant. Sergeant Andry and the other trooper stayed to secure the property and talk with Probus. Sugg initially sat near the driveway on a rock, but then moved to sit inside of an inoperable Jeep Cherokee that she and Wynn had recently purchased. During this time, Sugg was texting on her cell phone and smoking cigarettes.

Detective Smith completed the affidavit for the search warrant, which included the following information: the pseudoephedrine purchases by Sugg and Wynn on the previous day; Detective Smith's previous investigation of Sugg and Wynn for possession of precursors; the pending criminal charges against Sugg and Wynn for manufacturing methamphetamine; the fact that the officers had gone to the Sugg's residence for a knock and talk; Sugg's untruthful statements about her pseudoephedrine purchase and denial of knowledge of Wynn's purchase; Detective Smith's observation in plain view of the muriatic acid and charcoal lighter fluid on the back porch; Sugg's denial of consent; Detective Smith's entry into Sugg's residence so that Sugg could retrieve personal items; and Detective Smith's detection of the odor of burnt marijuana and observation of the stems and seeds that were consistent with marijuana. The search warrant was granted

and promptly executed. Pursuant to the warrant, the officers recovered marijuana from the ashtray; four baggies of methamphetamine from inside of a magnetic key holder; a glass jar containing pseudoephedrine pill soak; a glass jar with a combination of pseudoephedrine and triprolidine; a glass jar with methamphetamine in liquid form; numerous methamphetamine precursors, including muriatic acid, acetone, HEET, charcoal lighter fluid, drain cleaner, hydrogen peroxide, and camp fuel; pH strips; latex gloves; plastic tubing; and two Wal-mart receipts showing the purchase of various precursors, one found in Sugg's wallet and one out in the open. Sugg was arrested.

The State charged Sugg with Class B felony dealing in methamphetamine, Class D felony maintaining a common nuisance, Class D felony possession of precursors, Class D felony possession of a schedule II controlled substance, Class A misdemeanor possession of marijuana, and Class A misdemeanor possession of paraphernalia. On the first day of Sugg's jury trial, she filed a motion to suppress the evidence discovered pursuant to the search warrant, claiming that she was in custody, not given her Miranda warning, and then coerced into allowing the officers to enter her home. Following a hearing, the trial court denied the motion. The trial proceeded, during which the State moved to dismiss the charge of possession of a schedule II controlled substance. At the conclusion of the trial, the jury found Sugg guilty of the remaining charges. The trial court sentenced her to an aggregate term of ten years. Sugg now appeals.

**DISCUSSION AND DECISION**

Sugg first challenged the admission of evidence through a motion to suppress but now appeals following a completed trial. Thus, the issue is appropriately framed as

6

whether the trial court abused its discretion by admitting the evidence at trial. *Lanham v. State*, 937 N.E.2d 419, 421-22 (Ind. Ct. App. 2010). The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for abuse of discretion. *Bradford v. State*, 960 N.E.2d 871, 873 (Ind. Ct. App. 2012) (citing *Wilson v. State*, 765 N.E.2d 1265, 1272 (Ind. 2002)). An abuse of discretion occurs where the decision is clearly against the logic and effect of the facts and circumstances. *Id.* (citing *Smith v. State*, 754 N.E.2d 502, 504 (Ind. 2001)). Even if the trial court's decision was an abuse of discretion, we will not reverse if the admission of evidence constituted harmless error. *Combs v. State*, 895 N.E.2d 1252, 1255 (Ind. Ct. App. 2008), *trans. denied*. Error is harmless if it does not affect the substantial rights of the defendant. *Id.* at 1258.

Sugg first argues that the evidence should not have been admitted because it was found in violation of the Fourth Amendment. The Fourth Amendment to the United States Constitution protects an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures. *Washington v. State*, 922 N.E.2d 109, 111 (Ind. Ct. App. 2010) (citing *Howard v. State,* 862 N.E.2d 1208, 1210 (Ind. Ct. App. 2007)). Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Id.* (citing *Halsema v. State,* 823 N.E.2d 668, 676 (Ind. 2005)). When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.* (citing *Malone v. State,* 882 N.E.2d 784, 786 (Ind. Ct. App. 2008)).

7

Sugg contends that Detective Smith violated the Fourth Amendment during the knock and talk because the officers seized Sugg without a warrant. Specifically, she claims that Detective Smith's entrance into her residence was a Fourth Amendment violation because she gained entrance to the home using coercion and without a warrant. Sugg asserts that, when she refused to consent to a search of her home, she was told that she could not enter her residence to get shoes and a jacket without a police escort, which showed that she was clearly seized within the meaning of the Fourth Amendment.

A knock and talk investigation involves officers knocking on the door of a house, identifying themselves as officers, asking to talk to the occupant about a criminal complaint, and eventually requesting permission to search the house. *Chiszar v. State*, 936 N.E.2d 816, 825 (Ind. Ct. App. 2010), *trans. denied*. Such "knock and talk" investigations do not per se violate the Fourth Amendment. *Id.* "'The prevailing rule is that, absent a clear expression by the owner to the contrary, police officers, in the course of their official business, are permitted to approach one's dwelling and seek permission to question an occupant.'" *Redden v. State*, 850 N.E.2d 451, 458 (Ind. Ct. App. 2006) (quoting *Hayes v. State*, 794 N.E.2d 492, 496 (Ind. Ct. App. 2003), *trans. denied*), *trans. denied*. "'Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude a "seizure" has occurred.'" *Id.* (citations omitted). A seizure does not occur simply because a police officer approaches a person, asks questions, or requests identification. *Id.* "Courts examining the Fourth Amendment implications of the knock and talk procedure have held that a seizure occurs when, 'taking into account all of the circumstances surrounding the

8

encounter, the police conduct would "have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business."'" *Id.* at 458-59 (quoting *Hayes*, 794 N.E.2d at 496 (quoting *Kaupp v. Texas,* 538 U.S. 626, 629 (2003))).

Here, as the officers approached the front of Sugg's residence, they saw that their approach to the front door was completely blocked by boxes, decorations, and other items, and they observed Probus coming from the back of the home. The officers then approached the back porch and found Sugg standing outside. Detective Smith identified herself and asked Sugg about her recent pseudoephedrine purchase. This initial approach to speak with Sugg on the back porch was a consensual encounter that did not implicate the Fourth Amendment.

Further, nothing in the interaction between Detective Smith and Sugg concerning Sugg's pseudoephedrine purchase would have created in a reasonable person that she was not free to leave. A person is "seized" only when, by means of physical force or a show of authority, his or her freedom of movement is restrained. *Woodson v. State*, 966 N.E.2d 135, 139 (Ind. Ct. App. 2012) *trans. denied*. The test for existence of a "show of authority" is an objective one in that the question is not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person. *Id*. at 140. Examples of circumstances that might indicate a seizure would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the

9

officer's request might be compelled. *Id*. at 139. Here, two officers approached Sugg on the back porch, and no weapons were ever displayed. Sugg was not touched by the officers, and she was not spoken to in a way that she was compelled to comply with the officers' requests. The fact that Sugg called Wynn to talk with him about the officers' request to search the residence and then refused Detective Smith's request for consent to search clearly shows that Sugg did not feel compelled to comply with the officers' requests. Therefore, we conclude that Sugg was not seized.[7]

Additionally, Sugg next contends that the officers' restriction of Sugg's entrance into the residence while Detective Smith obtained the search warrant transformed the situation into a custodial one and violated the Fourth Amendment. We disagree. We note that the particular issue presented to us, whether a police officer's refusal to allow a defendant to enter his or her residence without a police officer until a search warrant has been obtained is a reasonable seizure that does not violate the Fourth Amendment, has not been determined in Indiana and, therefore, is a matter of first impression. However, the United States Supreme Court in *Illinois v. McArthur*, 531 U.S. 326 (2001) held that, under the circumstances of that case, such a refusal did not violate the Fourth Amendment and was a reasonable seizure.

In *McArthur*, a woman asked the police to accompany her to the trailer where she lived with her husband, so they could maintain the peace while she removed her

---

[7] We find it irrelevant that Sugg was outside with no coat or shoes when the officers approached her. She had voluntarily gone outside without shoes or a coat before the officers ever approached her on the back porch, and this was how the officers discovered her. No evidence was presented that Sugg ever asked to retrieve a coat or shoes and was denied such a request during the brief fifteen to thirty minute conversation with the officers.

10

belongings. *Id*. at 328. When she came back outside, she informed the officers that she had observed her husband hide some drugs under the couch. *Id*. at 329. One of the officers knocked on the door, advised the husband what they had been told, and requested consent to search the premises, which the husband denied. *Id*. One of the officers then left to obtain a search warrant, while the other officer remained and informed the husband, who was then outside on the porch, that he could not reenter the trailer unless accompanied by the officer. *Id*. During the two-hour time period before the other officer returned with the search warrant, the husband did reenter the trailer several times, and on each occasion, the officer stood just inside the door to observe what the husband did. *Id*. The Supreme Court held that the officers' conduct was reasonable under the Fourth Amendment in light of the following circumstances: (1) "the police had probable cause to believe that the trailer home contained evidence of a crime and contraband, namely, unlawful drugs"; (2) "the police had good reason to fear that, unless restrained, the husband would destroy the drugs before they could return with a warrant"; (3) "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) "the police imposed the restraint for a limited period of time, namely, two hours." *Id*. at 331-32. We find that reasoning relied on by the Supreme Court to be instructive to the resolution of the present case and, therefore, adopt it to determine the outcome here.

In the instant case, after Sugg refused her consent to search her residence, Detective Smith informed Sugg that she was going to petition for a search warrant. Because obtaining a search warrant could take some time and because Sugg was not

wearing a coat or shoes, Detective Smith informed Sugg that she could go into the house to retrieve any personal items she might need, but that she would need to be escorted by an officer to prevent the destruction of evidence or the opportunity to obtain a weapon. Sugg agreed to be accompanied into the residence.

Under the reasoning of *McArthur*, we first determine whether the police had probable cause to believe that Sugg's home contained evidence of a crime and contraband. At the time that Detective Smith restricted Sugg's entry into her home, she had probable cause to believe that Sugg was engaged in the manufacture of methamphetamine based on Sugg's contradictory and untruthful statements about her and Wynn's purchases of pseudoephedrine, the observation of precursors in plain view on the back porch, Sugg's inability to produce any pseudoephedrine pills, and Sugg's prior, pending charges for dealing methamphetamine. Therefore, the police here had probable cause to believe that Sugg's home contained evidence of the crime of manufacturing methamphetamine.

Second, we look to see if the police had good reason to fear that, if left unrestrained, Sugg would destroy evidence before they could return with the warrant. Prior to leaving to obtain a search warrant, the police had been questioning Suggs about her about her recent pseudoephedrine purchase. In response, Sugg made contradictory and untruthful statements about her and Wynn's purchases of pseudoephedrine and claimed that she had used all of the pills already and was not able to produce any of the pills. In their conversation with Sugg, the police also asked her about the muriatic acid and charcoal lighter fluid, which are both precursors for methamphetamine, located in

12

plain view on the porch. The police reasonably could have concluded that Sugg, suspecting an imminent search after the conversation with the police, would, if given the chance, quickly get rid of any contraband contained within the residence.[8]

Third, we look to determine if the police made reasonable efforts to reconcile their law enforcement needs with Sugg's demands of personal privacy. Here, the police, as in *McArthur*, neither searched the home nor arrested Sugg before obtaining the warrant. Instead, the police imposed the less strict restraint of preventing Sugg from entering the home unaccompanied. They did not disturb Sugg's home or belongings until a warrant was issued.

Lastly, we must determine if the police imposed the restraint for a limited period of time. Although an exact time period was not given as to how long it took from the time when Detective Smith left Sugg's home to the time she returned with the warrant in this case, Detective Smith did testify that she petitioned a judge for the search warrant at 5:45 p.m., and she returned to Sugg's home with the warrant at 6:19 p.m. The evidence also showed that the search warrant was actually signed by the judge at 6:07 p.m. This time period was no longer than necessary to obtain the warrant.

Therefore, the police in this case had probable cause to believe that Sugg's home contained contraband, which was evidence of a crime. They reasonably believed that Sugg, if left unrestrained to enter the home, would destroy that evidence or gain access to a weapon. The police imposed a restraint that was both limited and tailored reasonably to

---

[8] Detective Smith also testified that she was concerned that Sugg may have the opportunity to obtain a weapon if allowed to go inside the residence unaccompanied.

secure the needs of law enforcement while still protecting privacy interests. Finally, the restraint was imposed for only the limited amount of time that it took to obtain the warrant. We conclude that this restraint did not violate the Fourth Amendment, and this brief seizure of the premises was permissible.

Further, as we have determined that the restraint of only allowing Sugg into her home if accompanied by an officer was permissible under the Fourth Amendment, Detective Smith's observations while inside Sugg's residence were likewise permissible. "'[S]imple observations by officers standing in a place where they have a right to be are not searches in the constitutional sense.'" *Boggs v. State*, 928 N.E.2d 855, 863-64 (Ind. Ct. App. 2010) (quoting *Pavey v. State,* 477 N.E.2d 957, 960 (Ind. Ct. App. 1985)), *trans. denied*. Once inside Sugg's residence while accompanying her to retrieve her personal items, Detective immediately smelled the odor of burnt marijuana. As Sugg gathered her things, she made small talk about a chocolate bar, and showed Detective Smith the chocolate bar, which was located on the living room table. When she did so, Detective Smith observed stems and seeds consistent with marijuana in an ashtray on the table. Therefore, the evidence observed by Detective Smith while escorting Sugg into the home was not obtained in violation of the Fourth Amendment.

Sugg next contends that the evidence was obtained by the officers as a result of an illegal seizure and could not form the basis of the search warrant. The Fourth Amendment demands that no search warrant be issued unless it is supported by probable cause. *Cheever-Ortiz v. State*, 825 N.E.2d 867, 872 (Ind. Ct. App. 2005). Probable cause is a fluid concept, which is decided based on the facts of each case. *Id.* Probable cause to

14

search premises is established when a sufficient basis of fact exists to permit a reasonably prudent person to believe that a search of those premises will uncover evidence of a crime. *Id.* As we have concluded that the evidence obtained by the officers was not obtained in violation of the Fourth Amendment, it was not improper to include such evidence on the affidavit for the search warrant, and therefore, probable cause supported the issuance of the search warrant.[9] The evidence was not obtained in violation of the Fourth Amendment, and the trial court did not abuse its discretion in admitting the evidence at trial.

Sugg also argues that the trial court abused its discretion in admitting the evidence because it was discovered in violation of Article I, section 11 of the Indiana Constitution. She contends that the officers' conduct was unreasonable, particularly the fact that she was not allowed to enter her home to retrieve a jacket and shoes without a police escort.

Article I, Section 11 of the Indiana Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." Although virtually identical to the wording of the search and seizure provision in the federal constitution, Indiana's search and seizure clause is independently interpreted and applied. *Danner v. State*, 931 N.E.2d 421, 431 (Ind. Ct. App. 2010), *trans. denied*. Under the Indiana Constitution, the legality of a governmental search turns on an evaluation of the reasonableness of the police conduct

---

[9] Sugg also argues that the State could not rely on the good faith exception to the exclusionary rule because Detective Smith relied upon misleading information in her probable cause affidavit and that the erroneous admission of the evidence seized under the warrant was not harmless. Because we have concluded that the evidence was not illegally obtained, we do not reach these arguments.

under the totality of the circumstances. *Id*. (citing *Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005)). The burden is on the State to show that under the totality of the circumstances, the intrusion was reasonable. *Id.* (citing *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004)). Generally, the reasonableness of a search or seizure under the Indiana Constitution turns on the balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* (citing *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

Here, the officers' degree of suspicion that Sugg and Wynn were manufacturing methamphetamine was very high. Sugg and Wynn had each purchased one forty-eight-count box of pseudoephedrine the previous day from the same store and within minutes of each other. Both Sugg and Wynn had pending charges for dealing methamphetamine, and Detective Smith knew that, during the prior investigation at the residence, methamphetamine and precursors had been found. Detective Smith's suspicion based on this information led her to conduct a knock and talk at Sugg's residence.

The degree of intrusion on Sugg's ordinary activities was low. When the officers arrived at Sugg's residence, they found her standing outside on her back porch, so they did not even have to knock on the door. The officers approached Sugg outside and observed two precursors in plain view on the back porch, which heightened the officers' suspicion. Sugg was not restrained or restricted in her movement in any way. The officers briefly asked Sugg questions about her recent pseudoephedrine purchase and then requested her consent to search her residence after receiving untruthful and

16

contradictory answers to their questions. Sugg then used her cell phone to call Wynn to speak with him about consenting to the search while the officers waited. The fact that Sugg was not wearing a coat or shoes during this time did not increase the intrusion as she was voluntarily outside without them when the officer arrived, and she never asked to obtain them during the encounter with the officers.

The extent of law enforcement need to investigate whether Sugg and Wynn were manufacturing methamphetamine was high in the present case. Our Supreme Court has recognized that the process of manufacturing methamphetamine is very dangerous and poses a high risk of explosion and fire. *See Holder v. State*, 847 N.E.2d 930, 939-40 (Ind. 2006). Investigations into methamphetamine manufacturing, therefore, include both wanting to stop the production of the drug itself, but also to stop the risk of harm that the manufacturing process causes.

In sum, the police officers had compelling evidence that Sugg and her residence were involved in the manufacture of methamphetamine. They approached Sugg outside her residence and asked her questions about her recent pseudoephedrine purchase. The officers developed probable cause from Sugg's untruthful and contradictory answers and the observation of two precursors in plain view on the back porch. At that time, the officers decided to obtain a search warrant and needed to secure the scene while they waited for the warrant. The fact that Detective Smith would not allow Sugg to enter the residence without an escort before the warrant could be obtained was not unreasonable. This conduct was a minimal intrusion upon Sugg's ordinary activities in light of the risk of destruction of evidence or obtaining a weapon. Law enforcement officials had

substantial need to protect themselves during their investigation and to prevent the destruction of evidence while they secured a search warrant. In short, the police officers' conduct was reasonable throughout the investigation, and we conclude that the trial court properly admitted the evidence at trial.

Affirmed.

VAIDIK, J., and PYLE, J., concur.