## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED
Sep 08 2015, 8:21 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

John P. Brinson
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Ian McLean
Deputy Attorney General
Indianapolis, Indiana

## IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Deonte R. Hester, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | September 8, 2015 <br><br> Court of Appeals Case No. <br> 82A01-1411-CR-515 <br><br> Appeal from the <br> Vanderburgh Superior Court <br><br> The Honorable Robert J. Pigman, Judge <br><br> Trial Court Cause No. <br> 82D02-1303-FA-372 |

**Kirsch, Judge.**

Deonte R. Hester was found guilty after a jury trial of possession of cocaine[1] as a Class A felony, operating a vehicle while privileges are forfeited for life[2] as a Class C felony, resisting law enforcement[3] as a Class A misdemeanor, and possession of marijuana[4] as a Class A misdemeanor and was given a thirty-year aggregate sentence. He appeals and raises the following restated issues for our review:

> I. Whether the trial court erred in denying Hester's objection to the State's use of a peremptory challenge to strike an African-American juror from the jury venire;

> II. Whether the trial court abused its discretion in allowing State's Exhibit 2, the cocaine, to be admitted into evidence because the initial stop of his automobile was unlawful and the State failed to establish an adequate chain of custody;

> III. Whether the trial court abused its discretion and denied Hester's right to present a defense when it refused to allow him to admit into evidence statements or testimony of the deputy prosecuting attorney; and

---

[1] *See* Ind. Code § 35-48-4-6(a), (b)(3). We note that, effective July 1, 2014, a new version of this and other applicable statutes to this case were enacted. Because Hester committed his crimes prior to July 1, 2014, we will apply the statutes in effect at the time he committed his crimes.

[2] *See* Ind. Code § 9-30-10-17.

[3] *See* Ind. Code § 35-44.1-3-1(a)(3).

[4] *See* Ind. Code § 35-48-4-11.

IV.  Whether Hester's sentence is inappropriate in light of the nature of the offense and the character of the offender.

We affirm.

## Facts and Procedural History

On Saturday, March 9, 2013, at approximately 8:00 a.m., Evansville Police Department Officer Kacey Ross ("Officer Ross") was on routine patrol and supervising the field training of probationary officer Michael Ramirez ("Officer Ramirez").  The officers turned into the parking lot of Sunburst-Woodland Park Apartments.  When they entered the parking lot, Officer Ross observed a maroon Yukon parked in an area where vehicles were not supposed to park and in a manner that blocked several cars from moving.  The officers could not see anyone inside the Yukon due to the darkly-tinted windows.  Officer Ross decided that they should attempt to locate the owner of the Yukon and tell the owner to move the car rather than ignore the Yukon and risk getting called back later about the Yukon blocking people's cars.

The officers parked their patrol car approximately twelve feet behind the Yukon, and Officer Ross began to show Officer Ramirez how to run the license plate of the Yukon on the car's computer to determine the registered owner.  As Officer Ross was showing Officer Ramirez the results on the computer, the Yukon started to back up toward the patrol car.  Officer Ross exited the car and approached the driver's side of the Yukon in order to make contact with the driver.  The Yukon continued to move in reverse as Officer Ross was still

approaching. When Officer Ross made contact with the driver, the driver's window was partially open, and Officer Ross could smell the odor of burnt marijuana coming from the Yukon. Officer Ross instructed the driver, later identified as Hester, to put the Yukon in park. Instead, Hester began to drive forward. Officer Ross asked Hester for identification, and Hester asked "why." *Tr.* at 303. Officer Ross again asked Hester for his identification, and Hester, who had moved the Yukon approximately ninety degrees from its original position, put the vehicle in park and again asked why. Officer Ross could not see what Hester was doing inside of the Yukon, so he tried to open the driver's side door, but it was locked. The officer asked Hester to exit the vehicle, and Hester rolled up the window.

[5] Because Officer Ross was not able to see Hester through the tinted window, the officer moved to the front of the vehicle to look through the windshield. Officer Ross called for backup and could see Hester "moving around inside the vehicle . . . quite a bit within his area below what would be the dashboard." *Id.* at 14. Officer Ross told Hester to show his hands, and when he did not comply, Officer Ross drew his gun and pointed it in the direction of Hester, but not directly at him. Hester brought his hands up over the dashboard, and Officer Ross could see that Hester had a phone in one hand. He asked Hester what he was doing, to which Hester replied, "I'm calling my mom." *Id.* at 305. Ross went to the passenger side door and attempted to open it, but it was also locked, so Officer Ross returned to the front of the Yukon. In the meantime, Officer

Ramirez had also approached the Yukon with his gun drawn and saw Hester using his phone inside the vehicle.

[6] At that time, a group of people came out of the apartment building, and three or four of them identified themselves as family members of Hester. Officer Ross stated that these people, "were unruly at best," and Officer Ramirez went to the group to try to de-escalate the situation. *Id.* at 307. Meanwhile, Officer Ross saw Hester lower the window just enough to slide his identification outside of the vehicle and then close the window again. Officer Ross did not go toward the Yukon to retrieve the identification at that time. Shortly thereafter, Hester began to open the door and exit the Yukon. As Hester exited, Officer Ross could see that Hester did not have a weapon in his hands, so the officer holstered his gun. Officer Ross told Hester to turn around and put his hands on the side of the Yukon, and Hester showed his hands, but refused to comply with the officer's request. Instead, Hester began shuffling down the side of the vehicle and yelling to his family members. He then began to flee around the back of the Yukon.

[7] Officer Ross chased after Hester and attempted to employ his taser to stop Hester; however, the taser did not fire. A short time later, Hester slipped and fell in the grass, and Officer Ross was able to tackle him. Hester struggled with Officer Ross and resisted the officer's attempt to handcuff him. Hester also reached into his pants, and Officer Ross tried to gain control of the arm Hester had thrust down his pants. The officer was able to force Hester to remove his arm, and he observed that Hester was holding a plastic baggie that he tried to

throw. Officer Ross took the baggie from Hester's hand and handed it to Officer R.M. "Mike" Winters ("Officer Winters"), who had arrived on the scene as backup. Immediately after Officer Ross was able to get Hester handcuffed, Officer Winters returned the baggie to Officer Ross. At that time, Officer Ross noticed that the baggie taken from Hester contained two smaller baggies, which contained a white-colored powdery substance.

[8] Officer Ramirez searched Hester incident to his arrest and found a second plastic baggie, which contained a green, leafy substance, suspected to be marijuana, and approximately $1,000 in cash. Officer Ross field tested the white powdery substance and recorded that it tested positive for cocaine salts. He placed the baggies of suspected cocaine into an evidence bag, marked it, sealed it, and placed it, along with another evidence bag containing the suspected marijuana, into the evidence drop box at the Vanderburgh County Jail. Only Evidence Technician Stacy Lutz ("Lutz") and a lieutenant had access to the locked drop box. The evidence that Officer Ross placed into the drop box were retrieved on Monday, March 11, 2013 by Lutz and processed and placed in a secure evidence room.

[9] On March 12, 2013, the State charged Hester with Class A felony possession of cocaine, Class C felony operating a vehicle while privileges are forfeited for life, Class D felony battery, Class D felony resisting law enforcement, and Class A misdemeanor possession of marijuana, which was enhanced to a Class D felony due to a prior conviction. Hester was also alleged to be a habitual substance offender. On October 24, 2013, a hearing was held on Hester's motion to

continue his trial based on the fact that Hester had not received discovery regarding the forensic analysis of the substance taken from him during his arrest. During the hearing, the deputy prosecutor stated to the trial court:

> With respect to the Defendant's Motion for Continuance. Briefly on point three with regards to our lab report. A substance for another defendant was sent to the lab with reference to this case. That has been corrected. On Tuesday our Evidence Custodian delivered the appropriate substance, i.e. the substance related to Mr. Hester's case to the lab. They rushed. I talked to Kim Early who is an I.S.P. lab chemist this morning. She reported that yesterday they ran the substance on the mass spectrometer. The I.S.P. lab report will be available on Tuesday.

*Appellant's App*. at 183-84. Hester's counsel expressed his concern that the State "sent another sample of drugs to the lab under [Hester's] name." *Id*. at 184. The deputy prosecutor explained, "It wasn't sent with Mr. Hester's name. It was a different case sent up by accident because of a typo related to a number." *Id*. at 184-85. Hester's motion for a continuance was granted.

[10] A jury trial began on October 6, 2014. During voir dire, both Hester and the State exercised peremptory challenges to various potential jurors. In the first round of voir dire, the State peremptorily challenged N.P., and both the State and Hester peremptorily challenged K.G. Both of these jurors were African-American, as is Hester. In the second round of voir dire, potential juror S.T. was called, and both Hester and the State questioned her regarding the burden of proof and her ability to judge the case without bias or sympathy and without subjective determinations of a defendant's character. At the conclusion of the

questioning, the State peremptorily challenged S.T., who was also African-American. Hester objected and requested the trial court to take judicial notice that the State had used peremptory strikes against the only three African-American jurors and that Hester was also African-American. The State responded that although juror S.T. was "the perfect juror on paper," she lacked "the ability to understand anything we were going over," and the State wanted jurors that were "competent enough to wrap their heads around legal principals [sic]." *Id.* at 248-49. The trial court overruled Hester's objection to the State's use of a peremptory strike against S.T.

[11] The jury was selected, and the trial was held. During Officer Ross's testimony, he identified State's Exhibits 2 and 3 as the items taken from Hester during his arrest that he had sealed in evidence bags and placed in the evidence drop box. Evidence technician Lutz testified that she had taken the evidence bags containing the white, powdery substance and the green, leafy substance from the secure evidence room on October 21, 2013 and personally delivered them to the Indiana State Police ("ISP") lab. She specifically testified that State's Exhibit 2, the suspected cocaine, had been sealed in a bag with brown tape, and a red tape seal was placed on the evidence by the ISP lab. Lutz further stated that she personally picked up State's Exhibits 2 and 3 from the ISP lab on November 5, 2013 and placed them in the secure evidence room, where they were kept until the first day of trial, when they were signed out to Officer Ross.

[12] ISP chemist Kimberly Early testified that, on October 21, 2013, she received the suspected drug evidence seized from Hester, and the evidence was securely kept

in the ISP lab. Early's analysis determined State's Exhibit 2 to contain 8.56 grams of cocaine base and State's Exhibit 3 to contain 0.91 grams of marijuana. Hester objected to the admission of State's Exhibits 2 and 3 into evidence, alleging they were illegally seized and that a proper chain of custody had not been proven for the evidence. The trial court overruled the objection. At the conclusion of the trial, the jury found Hester guilty of Class A felony possession of cocaine, Class C felony operating a vehicle while privileges are forfeited for life, Class A misdemeanor resisting law enforcement, and Class A misdemeanor possession of marijuana. Prior to trial, the State had dismissed the charge of Class D felony battery, and subsequent to the trial, the State dismissed the habitual substance offender allegation. At sentencing, the trial court imposed an aggregate thirty-year executed sentence. Hester now appeals.

## Discussion and Decision

### I. *Batson*[5] Challenge

[13] Hester argues that the State exercised its peremptory challenge to remove an African-American juror from the jury venire in violation of his rights to equal protection guaranteed by the Fourteenth Amendment to the United States Constitution. "The use of a peremptory challenge to strike a potential juror solely on the basis of race violates the Equal Protection Clause of the

---

[5] *Batson v. Kentucky,* 476 U.S. 79 (1986).

Fourteenth Amendment to the United States Constitution." *Killebrew v. State,* 925 N.E.2d 399, 401 (Ind. Ct. App. 2010) (citing *Jeter v. State,* 888 N.E.2d 1257, 1262 (Ind. 2008), *cert. denied* 555 U.S. 1055 (2008)), *trans. denied.* On appeal, a trial court's decision concerning whether a peremptory challenge is discriminatory is given great deference and will be set aside only if found to be clearly erroneous. *Id.* When a party raises a *Batson* challenge, the trial court must undertake a three-step test. *Jeter,* 888 N.E.2d at 1263. First, it must determine whether the party making the *Batson* objection has made a *prima facie* showing that a peremptory challenge was exercised on the basis of race. *Id.* Second, after the contesting party makes a *prima facie* showing of discrimination, the burden shifts to the party exercising its peremptory challenge to present a race-neutral explanation for striking the juror. *Id.* Third, if a race-neutral explanation is proffered, the trial court must then determine if the challenger has carried its burden of proving purposeful discrimination. *Id.*

[14]   Generally, if the State's reason for the challenge is facially based on something other than race, it is deemed race-neutral. *Collier v. State*, 959 N.E.2d 326, 328 (Ind. Ct. App. 2011). "'Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" *Addison v. State*, 962 N.E.2d 1202, 1209 (Ind. 2012) (quoting *Purkett v. Elem,* 514 U.S. 765, 768 (1995) (per curiam)). "Although the race-neutral reason must be more than a mere denial of improper motive, the reason need not be particularly 'persuasive, or even plausible.'" *Id.*

[15]     In the present case, the record shows that the State used its peremptory challenges to strike the only three African-American jurors on the venire panel. Hester objected specifically to the striking of juror S.T., noting that she was the third African-American juror the State had stricken. The State explained that it exercised its peremptory challenge to strike S.T. because she lacked "the ability to understand anything we were going over and in a case where the State has a burden of proof the State has to know that jurors are competent enough to wrap their heads around legal principals [sic]." *Tr.* at 248-49. The State further stated, "Even though she was great on paper, she wasn't able to wrap her head around anything [Hester's counsel] or I was saying. That is why I struck her." *Id.* at 249. In response, Hester's counsel disagreed, stating that, he believed she answered his questions "quite coherently" and that "she seems to be competent." *Id.* at 249-50. The trial court then overruled Hester's objection and allowed the State's request to strike S.T.

[16]     In our review of the State's explanation and the questioning of S.T., we do not find any racial motivation on the State's part in striking S.T. The reason given by the State was that S.T. lacked the ability to understand the concepts about which the attorneys had questioned her. From her answers to the questions posed to her, S.T. appeared hesitant and unable to accept that her decision should be based on the evidence presented and not on her desire to know more information. When asked by the State in a hypothetical of the prosecutor being charged with dropping a pen and whether S.T. would be comfortable only hearing evidence as to whether or not the prosecutor had dropped the pen, S.T.

said no and that she would want to know something else, "some of the small things." *Id*. at 239. The State provided a race-neutral explanation for using its peremptory challenge to strike S.T. from the jury. We conclude that the trial court did not err in denying Hester's *Batson* challenge.

## II. Admission of Evidence

[17] Although Hester originally challenged the admission of the evidence through a pre-trial motion to suppress, he appeals following a completed jury trial and thus challenges the admission of such evidence at trial. The admission or exclusion of evidence is entrusted to the discretion of the trial court. *Collins v. State*, 966 N.E.2d 96, 104 (Ind. Ct. App. 2012) (citing *Farris v. State,* 818 N.E.2d 63, 67 (Ind. Ct. App. 2004), *trans. denied*). We will reverse a trial court's decision only for an abuse of discretion. *Id.* We will consider the conflicting evidence most favorable to the trial court's ruling and any uncontested evidence favorable to the defendant. *Id*. (citing *Taylor v. State,* 891 N.E.2d 155, 158 (Ind. Ct. App. 2008), *trans. denied*, *cert. denied* 555 U.S. 1142 (2009)). An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or it misinterprets the law. *Id.* In determining whether an error in the introduction of evidence affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury. *Id*. (citing *Oldham v. State,* 779 N.E.2d 1162, 1170 (Ind. Ct. App. 2002), *trans. denied*).

## A. Legality of Stop

Hester argues that the trial court abused its discretion in admitting State's Exhibit 2, the cocaine, into evidence because it was seized illegally and without a warrant. He contends that the evidence was obtained in violation of the Fourth Amendment as the stop of the Yukon was unlawful because the officers lacked reasonable suspicion to stop the vehicle. Hester also asserts that the evidence was obtained in violation of Article 1, section 11 of the Indiana Constitution because the stop of the Yukon was not reasonable under the totality of the circumstances.

The Fourth Amendment to the United States Constitution protects an individual's privacy and possessory interests by prohibiting unreasonable searches and seizures. *Sugg v. State*, 991 N.E.2d 601, 607 (Ind. Ct. App. 2013) (citing *Washington v. State,* 922 N.E.2d 109, 111 (Ind. Ct. App. 2010)), *trans. denied*. Generally, a search warrant is a prerequisite to a constitutionally proper search and seizure. *Id.* When a search is conducted without a warrant, the State has the burden of proving that an exception to the warrant requirement existed at the time of the search. *Id.* The propriety of a warrantless search is subject to *de novo* review. *Montgomery v. State*, 904 N.E.2d 374, 378 (Ind. Ct. App. 2009) (citing *Engram v. State,* 893 N.E.2d 744, 748 (Ind. Ct. App. 2008), *trans. denied*), *trans. denied.*

There are three levels of police investigation, two of which implicate the Fourth Amendment and one of which does not. First, the Fourth Amendment requires that an arrest or detention for more than a short period be justified by probable

cause.  *Powell v. State*, 912 N.E.2d 853, 859 (Ind. Ct. App. 2009) (citing *Overstreet v. State*, 724 N.E.2d 661, 663 (Ind. Ct. App. 2000), *trans. denied*). Second, it is well-settled under the Fourth Amendment that the police may, without a warrant or probable cause, briefly detain an individual for investigatory purposes if, based on specific and articulable facts, the officer has a reasonable suspicion that criminal activity has or is about to occur.  *Id.*  The third level of investigation occurs when a law enforcement officer makes a casual and brief inquiry of a citizen which involves neither an arrest nor a stop. *Id*.  In this type of consensual encounter no Fourth Amendment interest is implicated.  *Id*.

[21] "Not every encounter between a police officer and a citizen amounts to a seizure requiring objective justification."  *Overstreet,* 724 N.E.2d at 663.  A person is seized only when his or her freedom of movement is restrained by means of physical force or a show of authority.  *Powell*, 912 N.E.2d at 859.  It is not the purpose of the Fourth Amendment to eliminate all contact between police and the citizenry, and what constitutes a restraint on liberty prompting a person to conclude that he is not free to leave will vary depending upon the particular police conduct at issue and the setting in which the conduct occurs. *Id*. at 860 (citing *Michigan v. Chesternut,* 486 U.S. 567, 573 (1988)).  Further, the test for existence of a show of authority is an objective one:  not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person.  *Id*. (citing *California v. Hodari D.,* 499 U.S. 621, 628 (1991)).

[22] In this case, the record shows that the Yukon that Hester was driving was parked in an area of the apartment complex parking lot where vehicles were not supposed to park and in a manner that it was blocking several cars from moving. When the officers entered the parking lot, they noticed the Yukon and decided that they should attempt to locate the owner and tell the owner to move the car rather than ignore the Yukon and risk getting called back later about the Yukon blocking people's cars. The officers parked their patrol car approximately twelve feet behind the Yukon and did not activate the car's lights or siren. The officers could not see anyone inside the Yukon due to the darkly-tinted windows. After they parked behind the Yukon, Officer Ross began to show Officer Ramirez how to run the license plate of the Yukon on the car's computer to determine the registered owner. As Officer Ross was doing this, the Yukon started to back up toward the patrol car. At that time, Officer Ross exited the car and approached the driver's side of the Yukon in order to make contact with the driver and inform the driver that the vehicle was illegally parked and not to park there in the future. The Yukon continued to move in reverse as Officer Ross was still approaching. When Officer Ross made contact with the driver, the driver's window was partially open, and Officer Ross could immediately smell the odor of burnt marijuana coming from the Yukon.

[23] Given these facts, we conclude that the officers' actions of parking behind the Yukon and approaching the vehicle did not constitute an investigatory stop or seizure under the Fourth Amendment. Instead, the evidence supports the conclusion that the initial encounter between Officer Ross and Hester in the

present case was consensual and, therefore, did not implicate the Fourth Amendment's protections against unreasonable searches and seizures. Thus, under the circumstances, Officer Ross did not need to possess reasonable suspicion of wrongdoing in order to park behind or approach the Yukon to identify the owner of the vehicle and inform him that his vehicle was parked illegally and not to park there in the future. As soon as Officer Ross smelled the odor of burnt marijuana coming from the inside of the Yukon, he then possessed reasonable suspicion that a crime was being committed. *See State v. Hawkins*, 766 N.E.2d 749, 752 (Ind. Ct. App. 2002) (finding that the odor of burnt marijuana coming from a vehicle establishes probable cause to search the vehicle under the Fourth Amendment), *trans. denied*. The trial court did not abuse its discretion in overruling Hester's objection to the admission of the cocaine evidence based upon the Fourth Amendment.

[24] Hester also argues that the trial court abused its discretion in admitting the cocaine because the officers' actions of parking behind his vehicle and approaching it violated the Indiana Constitution. Article I, Section 11 of the Indiana Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure, shall not be violated . . . ." Although virtually identical to the wording of the search and seizure provision in the federal constitution, Indiana's search and seizure clause is independently interpreted and applied. *Danner v. State*, 931 N.E.2d 421, 431 (Ind. Ct. App. 2010), *trans. denied*. Under the Indiana Constitution, the legality of a governmental search turns on an evaluation of the

reasonableness of the police conduct under the totality of the circumstances. *Id.* (citing *Myers v. State*, 839 N.E.2d 1146, 1153 (Ind. 2005)). The burden is on the State to show that under the totality of the circumstances, the intrusion was reasonable. *Id.* (citing *State v. Bulington*, 802 N.E.2d 435, 438 (Ind. 2004)). Generally, the reasonableness of a search or seizure under the Indiana Constitution turns on the balance of: (1) the degree of concern, suspicion, or knowledge that a violation has occurred; (2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities; and (3) the extent of law enforcement needs. *Id.* (citing *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005)).

[25] Here, the record reveals that Officers Ross and Ramirez parked their patrol car behind the Yukon in which Hester was seated. The Yukon was parked illegally and was blocking several vehicles. The officers parked behind the Yukon with the intention of running the vehicle's license plate to determine the identity of the owner and inform the owner to move the vehicle. The officers did not activate the patrol car's lights or sirens. As the officers were running the license plate, the Yukon began to back up toward the patrol car. At that time, Officer Ross exited and approached the driver's side door to make contact with the driver and inform him that he needed to move the Yukon and not to park there in the future. Officer Ross did not have his weapon displayed as he initially approached the Yukon. As soon as he made contact with the driver, Officer Ross smelled the odor of burnt marijuana coming from the partially-open window of the Yukon. Under these circumstances, we conclude that the

officers' action of parking behind the Yukon and Officer Ross's approach and initial contact with Hester constituted a consensual encounter, which did not violate Hester's rights against unreasonable search and seizure under Article 1, section 11 of the Indiana Constitution. The trial court did not abuse its discretion in overruling Hester's objection to the admission of the cocaine evidence based upon Article 1, section 11 of the Indiana Constitution.

### B. Chain of Custody

[26]   Hester next argues that the trial court abused its discretion in admitting State's Exhibit 2 at trial because the State failed to prove an adequate chain of custody for the cocaine evidence. He contends that "the evidence does not show that the exhibit passed through various hands undisturbed." *Appellant's Br*. at 23. Hester specifically alleges that, because Officer Winters did not testify at trial, the evidence did not show what he did with the cocaine while he held it for Officer Ross while Officer Ross was handcuffing Hester. Hester also asserts that no evidence was presented to explain the discrepancies in description of the evidence between Officer Ross's report and the lab analysis done by the ISP lab. Hester further claims that no evidence explained the circumstances of how another defendant's evidence was sent to the ISP lab in reference to Hester's case. He, therefore, contends that, based on these circumstances, a proper chain of custody was not established, and the cocaine evidence should not have been admitted at trial.

[27]   In order for physical evidence to be admissible the evidence regarding its chain of custody must strongly suggest the exact whereabouts of the evidence at all

times. *Filice v. State*, 886 N.E.2d 24, 34 (Ind. Ct. App. 2008) (citing *Culver v. State,* 727 N.E.2d 1062, 1067 (Ind. 2000)), *trans. denied*. The State must provide "reasonable assurances that the property passed through various hands in an undisturbed condition." *Id.* (quoting *Culver*, 727 N.E.2d at 1067). Because the State need not establish a perfect chain of custody, slight gaps go to the weight, not the admissibility, of the evidence. *Id.* There is a presumption of regularity in the handling of exhibits by public officers. *Id*. (citing *Murrell v. State,* 747 N.E.2d 567, 572 (Ind. Ct. App. 2001), *trans. denied*). Therefore, merely raising the possibility of tampering is insufficient to make a successful challenge to the chain of custody. *Id*. (citing *Cockrell v. State,* 743 N.E.2d 799, 809 (Ind. Ct. App. 2001)).

[28] In the present case, the evidence showed that Officer Ross seized the cocaine from Hester during his arrest and briefly handed the baggie to Officer Winters to hold while Officer Ross struggled to get Hester handcuffed. Once Hester was handcuffed, Officer Ross again took possession of the cocaine and placed it in an evidence bag, which he sealed and placed into the secure evidence drop box on the day of the arrest, March 9, 2013. The cocaine remained in the drop box until it was retrieved by evidence technician Lutz on Monday, March 11, 2013 and processed and placed in a secure evidence room until Lutz personally transported the cocaine to the ISP lab for analysis. The evidence had been sealed with brown tape by Officer Ross, who marked the seals with the case number and his badge number. *Tr*. at 313. This seal was broken by chemist Early at the ISP lab, who analyzed the drugs, and when she was finished, she

re-sealed the cocaine with red tape and placed her own identifying information on the seal. *Id*. at 397, 429. This evidence was sufficient to establish a proper chain of custody and to permit the cocaine to be admitted into evidence.

[29] Hester contends that the cocaine was handled by another officer at the scene, "whose identity was murky." *Appellant's Br*. at 26. However, the officer to whom Officer Ross handed the cocaine for the brief time it took him to handcuff the struggling Hester was identified as Officer Winters, who returned the cocaine to Officer Ross as soon as Hester had been subdued. Hester also claims that the cocaine analyzed by Early did not match the description of the cocaine seized by Officer Ross. Officer Ross's report described the cocaine as a "white powdery substance" that field tested "positive for cocaine salts," *Exhibit* D, but Early's analysis described the cocaine as an "off white powdery substance" that was determined to contain cocaine base. *State's Ex*. 5. Early testified at trial that descriptions of cocaine vary depending on the environment in which it is viewed and the viewer's subjective judgment call. *Tr*. at 458-59. Further, although the field test stated that the evidence tested positive for cocaine salts and the lab analysis determined it contained cocaine base, there is no differentiation in the statute between types of cocaine, so such evidence merely suggests possibility of tampering and is insufficient to make a successful challenge to the chain of custody. *Filice*, 886 N.E.2d at 34.

[30] As to Hester's contention that no evidence was presented to explain how another defendant's evidence was sent to the ISP lab in reference to Hester's case, the State explained to the trial court that, although evidence from another

case was originally sent to the ISP lab in reference to Hester's case, the actual evidence for Hester's case was in the secure evidence room and did not leave until the mistake was discovered and resolved. *See Espinoza v. State*, 859 N.E.2d 375, 382 (Ind. Ct. App. 2006) ("An adequate foundation establishing a continuous chain of custody is established if the State accounts for the evidence at each stage from its acquisition, to its testing, and to its introduction at trial."). We, therefore, find that the State presented evidence to "strongly suggest the exact whereabouts of the evidence at all times" and to establish a sufficient chain of custody. *Filice*, 886 N.E.2d at 34.

## III. Exclusion of Evidence

Criminal defendants are guaranteed a meaningful opportunity to present a complete defense. *Hyser v. State*, 996 N.E.2d 443, 447 (Ind. Ct. App. 2013). "Although a defendant's right to present a defense is of the utmost importance, it is not absolute." *Manuel v. State*, 971 N.E.2d 1262, 1266 (Ind. Ct. App. 2012). Both the accused and the State are required to comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence. *Id.*

Hester argues that the trial court abused its discretion when it did not allow him to admit Defendant's Exhibit C into evidence, the transcript from the October 24, 2013 hearing on his motion to continue, and to elicit testimony from the prosecutor regarding the same subject matter. He contends that the transcript, which contained the prosecutor's statement about how evidence from another

defendant's case was sent to the ISP lab in reference to this case, should have been admitted because it was relevant to his defense that the substance taken from him was not the same substance sent to the ISP lab for testing. In the alternative, he alleges he should have been allowed to elicit testimony from the prosecutor regarding the evidence being sent to the lab. Hester asserts that the imperfections in the chain of custody supported his theory, and the jury should have been allowed to know that the State had originally sent another defendant's evidence in reference to Hester's case.

[33] The standard of review for admissibility of evidence issues is whether the trial court's decision was an abuse of discretion. *Hyser*, 996 N.E.2d at 448. Generally, errors in the admission or exclusion of evidence are to be disregarded as harmless unless they affect the substantial rights of a party. *Id.* In determining whether an evidentiary ruling affected a party's substantial rights, the court assesses the probable impact of the evidence on the trier of fact. *Id.*

[34] Hester asserts that, because the trial court admitted the cocaine into evidence, all of his contentions regarding imperfections in the chain of custody go to the weight of the evidence, and therefore, the transcript should have been admitted as well. *See Filice*, 886 N.E.2d at 34. ("Because the State need not establish a perfect chain of custody, slight gaps go to the weight, not the admissibility, of the evidence."). Assuming without deciding that the trial court abused its discretion in excluding the evidence, we find the error to be harmless. At the October 24, 2013 hearing on Hester's motion to continue, the prosecutor stated

that, due to a typographical error, another defendant's evidence was sent to the ISP lab in reference to Hester's case. *Appellant's App*. at 183. The prosecutor further explained that, once the error was detected, the evidence seized from Hester was submitted to the ISP lab for analysis on an expedited basis. *Id*. When Hester attempted to have the transcript admitted at trial, the prosecutor explained that, although evidence from another case had been sent to the ISP lab in reference to Hester's case, the actual evidence seized from Hester remained in the secure evidence room until after the error was detected and the evidence was then sent to the lab on an expedited basis. *Tr*. at 499. Both evidence technician Lutz and ISP chemist Early testified that they had no information regarding any other evidence being taken to the lab in reference to Hester's case and that the evidence seized from Hester was taken to the lab on October 21, 2013. *Id*. at 398-400, 410.

[35] Additionally, the State submitted evidence that after Officer Ross seized the cocaine from Hester, he placed it in an evidence bag, which he sealed with brown tape, marked with the case number and his badge number, and placed into the secure evidence drop box on the day of the arrest. The cocaine remained in the drop box until it was retrieved by evidence technician Lutz two days later and then processed and placed in a secure evidence room until Lutz personally transported the cocaine to the ISP lab for analysis on October 21, 2013. The seal placed on the evidence by Officer Ross was broken by chemist Early at the ISP lab, who analyzed the drugs, and Early re-sealed the cocaine with red tape and placed her own identifying information on the seal after she

concluded her analysis. *Id*. at 397, 429. We conclude that any error in excluding the challenged evidence was outweighed by the substantial evidence establishing a proper chain of custody for the cocaine evidence and was harmless.

## IV. Inappropriate Sentence

[36] Hester contends that his thirty-year aggregate sentence is inappropriate in light of the nature of the offense and character of the offender. Under Indiana Appellate Rule 7(B), "we may revise any sentence authorized by statute if we deem it to be inappropriate in light of the nature of the offense and the character of the offender." *Corbally v. State*, 5 N.E.3d 463, 471 (Ind. Ct. App. 2014). The question under Appellate Rule 7(B) is not whether another sentence is *more* appropriate; rather, the question is whether the sentence imposed is inappropriate. *King v. State,* 894 N.E.2d 265, 268 (Ind. Ct. App. 2008). It is the defendant's burden on appeal to persuade the reviewing court that the sentence imposed by the trial court is inappropriate. *Chappell v. State,* 966 N.E.2d 124, 133 (Ind. Ct. App. 2012), *trans. denied.*

[37] A person who commits a Class A felony shall be imprisoned for a fixed term of between twenty and fifty years, with the advisory sentence being thirty years. Ind. Code § 35-50-2-4. A person who commits a Class C felony shall be imprisoned for a fixed term of between two and eight years, with the advisory sentence being four years. Ind. Code § 35-50-2-6. A person who commits a Class A misdemeanor shall be imprisoned for a fixed term of not more than one

year. Ind. Code § 35-50-3-2. In the present case, Hester was sentenced to thirty years for his Class A felony conviction for possession of cocaine, four years for his Class C felony conviction for operating a vehicle while privileges are forfeited for life, one year for his Class A misdemeanor conviction for resisting law enforcement, and one year for his conviction for Class A misdemeanor conviction for possession of marijuana. The trial court ordered the sentences to be served concurrent with each other, resulting in a thirty-year aggregate sentence. He is, therefore, essentially arguing that his thirty-year advisory sentence for a Class A felony conviction is inappropriate.

[38] As for the nature of the offense, Hester was found in possession of almost three times the amount of cocaine required to commit the offense for which he was convicted. He also fled the police when they initially attempted to handcuff him and continued to struggle once Officer Ross caught him. He also tried to toss the baggie of cocaine and distance himself from it as he struggled with the officer. Additionally, at the time the police encountered Hester he was operating a vehicle when he was aware that his driving privileges had been forfeited for life.

[39] As to Hester's character, he had a lengthy criminal history dating back to 1996 when he was a juvenile. As a juvenile, Hester had adjudications for resisting law enforcement, battery, possession of marijuana, and possession of cocaine. As an adult, Hester had two Class D felony convictions for operating a vehicle after being adjudged a habitual traffic offender, a Class A misdemeanor conviction for possession of marijuana, a Class A misdemeanor conviction for

carrying a handgun without a license, a Class D felony conviction for possession of marijuana, a Class C felony conviction for operating a vehicle while privileges are forfeited for life, and a Class A misdemeanor conviction for resisting law enforcement. At the time he was arrested in the instant case, he had pending charges for possession of marijuana and operating a vehicle while privileges are forfeited for life. Additionally, while out on bond for the present case, Hester was charged in Marion County, Indiana with operating a vehicle while privileges are forfeited for life and was also cited for driving without a valid license in Cook County, Georgia. This lengthy criminal history shows a disregard for the law and disrespect for the authority of the courts. In light of the nature of the offense and the character of the offender, we do not find that Hester's advisory sentence of thirty years was inappropriate.

[40] Affirmed.

Najam, J., and Barnes, J., concur.