Kelly E. CULVER, Appellant
(Defendant below),

v.

STATE of Indiana, Appellee
(Plaintiff below).

No. 84S00–9801–CR–18.

Supreme Court of Indiana.

April 10, 2000.

Matthew R. Effner, Daniel L. Weber, Terre Haute, IN, Attorneys for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Andrew L. Hedges, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

SULLIVAN, Justice.

Defendant Kelly Culver was convicted of Murder for stabbing his victim to death. He claims that the trial court erroneously admitted DNA and blood evidence and that his counsel was ineffective for failing to object to its admission. He also contends that the jury should have been given the opportunity to convict him of the lesser-included offense of voluntary manslaughter and that the judge sentenced him based on invalid considerations. We find no error in the admission of the evidence. Nor do we find that counsel was ineffective, that the jury was incorrectly instructed, or that the sentence was improperly imposed.

This Court has jurisdiction over this direct appeal because the longest single sentence exceeds 50 years. Ind. Const. art. 7, § 4; Ind. Appellate Rule 4(A)(7).

### Background

The facts most favorable to the verdict indicate that in the early morning hours of May 11, 1997, Defendant left a neighbor's house intoxicated and was followed home by his girlfriend, Lori McCullough. Defendant began arguing with McCullough. When these arguments escalated, McCullough called her brother, Brad Peters, to come pick up her and her children.[1] Defendant threatened to fight Peters and then rummaged through a kitchen drawer where he had previously stored an ice pick.[2]

As they left the apartment arguing, other residents had gathered in the hallway, including Charles Horton who was standing in his doorway. According to one witness, Horton was preparing for work which began at 5:00 a.m. By 4:20 a.m., Peters had managed to pick up his sister and her children without further incident.

Shortly after 5:00 a.m., while driving on Sanford Road just east of State Road 63, Mark Barrett observed Horton's car parked in the middle of the road. Concerned that he would be unable to bypass

---

1. Neither McCullough or Defendant owned a vehicle.

2. McCullough also testified that this ice pick had been on the floor the week before May 11th next to Defendant's bed. Defendant placed the ice pick in the kitchen drawer when McCullough brought her children to his apartment.

the car without hitting it, Barrett slowed down briefly and then stopped his car. He observed Defendant bent over along the side of the road as if he were searching for an item. Defendant approached Barrett's vehicle, then turned and walked away. At this time, Defendant was wearing a black jacket. Later that morning, Chris Newhart saw Defendant trying to hitchhike a few hundred feet north of Sanford Road. Now Defendant was not wearing a shirt or jacket despite the cold weather.

Around 6:00 a.m., at the intersection of State Road 63 and Sanford Road, Defendant approached Stephen Gariepy's truck as Gariepy stopped at a stop sign. Defendant solicited Gariepy's help, telling him that he and a friend had been attacked, that he believed his attackers killed his friend, and that he needed a ride into Terre Haute to notify police. Because Defendant was shirtless, Gariepy gave him a plaid shirt to wear. At approximately 6:15 a.m., Defendant exited Gariepy's truck at a railroad crossing in Terre Haute within the proximity of McCullough's residence. Defendant and Gariepy parted without ever having notified the police of the alleged attack.

At 6:50 a.m., while asleep at her residence, McCullough was awakened by a "nervous and scared" Defendant. Defendant, who had been wearing black sweatpants and a black Adidas jacket that morning, was now wearing black sweatpants and a plaid shirt. He had mud all over his sweatpants and red stains on his thermal boxer shorts. As Defendant requested, McCullough gave him a shirt to wear. As he changed clothes, she saw him remove a bundle of money from his sweatpants. Before leaving, Defendant told McCullough that he had done something wrong, that he was in trouble, and to tell people that he never owned a black Adidas jacket.

At 9:30 a.m., Vigo County Police Officer Steve Barnhart discovered Horton's abandoned car on Sanford Road just east of State Road 63. Officer Barnhart observed blood in the car and on the road outside of the car. Looking in the nearby wooded area, Officer Barnhart found Horton's body. Horton had been stabbed twenty-eight times with an ice-pick. Horton received a final stab wound through his right eye that entered his brain. Officer Barnhart discovered the body with the ice-pick still in Horton's eye.

Three days after discovering Horton's body, police found Defendant's Adidas jacket near the intersection of Sanford Road and State Road 63. After obtaining a search warrant for Defendant's apartment, officials uncovered a pair of black sweatpants and thermal boxer shorts in the kitchen trash container.

The State charged Defendant with Murder.[3] The jury found Defendant guilty as charged. The trial court sentenced Defendant to 65 years of incarceration.

Additional facts will be provided as necessary.

*Discussion*

I

Defendant contends that the trial court committed reversible error when it failed to exclude the testimony of Melissa Smrz, the State's DNA expert. He asserts that the State violated the trial court's discovery order because the expert's detailed DNA report was not provided until just prior to trial. He argues that the tardiness of this report compromised his right to a speedy trial, his right to cross-examine witnesses, his right to obtain witnesses in his favor, and his right to effective assistance of counsel as guaranteed by the Sixth Amendment of the United States Constitution.

A

Notwithstanding the pre-trial hearing on Defendant's Motion to Exclude such testimony, Defendant failed to object to the DNA expert's testimony at trial. We have consistently held that to preserve

---

**3.** Ind.Code § 35–42–1–1(1) (1993).

an error in the overruling of a pre-trial motion, the appealing party must have contemporaneously objected to the admission of the evidence at trial. *See White v. State*, 687 N.E.2d 178, 179 (Ind.1997); *Poulton v. State*, 666 N.E.2d 390, 393 (Ind. 1996); *Conner v. State*, 580 N.E.2d 214, 219–20 (Ind.1991), *cert. denied*, 503 U.S. 946, 112 S.Ct. 1501, 117 L.Ed.2d 640 (1992). This affords the trial court the opportunity to make a final ruling on the matter in the context in which the evidence is introduced. *See Vehorn v. State*, 717 N.E.2d 869, 872 (Ind.1999); *White*, 687 N.E.2d at 179. Consequently, the failure to lodge a contemporaneous objection at trial now prevents Defendant from raising this issue on appeal.

B

Defendant concedes that this issue might be waived due to defense counsel's failure to object at trial. As alternative grounds for relief, Defendant asserts that the failure to object to the DNA expert's testimony constituted ineffective assistance of counsel.

■ We evaluate Sixth Amendment claims of ineffective assistance of counsel by applying the two-part test established in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See, e.g., Canaan v. State*, 683 N.E.2d 227, 229 (Ind.1997), *cert. denied*, 524 U.S. 906, 118 S.Ct. 2064, 141 L.Ed.2d 141 (1998); *Lowery v. State*, 640 N.E.2d 1031, 1041 (1994), *cert. denied*, 516 U.S. 992, 116 S.Ct. 525, 133 L.Ed.2d 432 (1995). To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness. *See id.* The defendant must also show adverse prejudice as a result of the deficient performance.

*See Brown v. State*, 698 N.E.2d 1132, 1139–40 (Ind.1998), *cert. denied*, — U.S. —, 119 S.Ct. 1367, 143 L.Ed.2d 527 (1999). When an ineffective assistance of counsel claim is based on a failure to object to the admission of evidence, the defendant must first demonstrate that the objection would have been sustained had defense counsel objected at trial. *See Lowery v. State*, 640 N.E.2d at 1042.

■ Here, we do not find that an objection to the DNA expert's testimony would have been sustained, nor has Defendant made such a showing. Defendant merely asserts that the trial court should have excluded the DNA expert's testimony due to the untimely submission of the DNA detailed report.

In ruling the evidence admissible, the trial court relied on our holding in *Woodcox v. State*, 591 N.E.2d 1019 (Ind.1992), *overruled on other grounds, Richardson v. State*, 717 N.E.2d 32 (Ind.1999). In *Woodcox*, we held that permitting the DNA expert to testify was not an abuse of discretion. While the DNA report was not available until the day of trial, the defendant had been notified sixteen days prior to trial of the identity of the expert who would testify. *Id.* at 1026. We concluded that the defendant had had ample time to interview or depose the expert but had made no attempt to do so. *Id.* Nor had the defendant sought a continuance to take additional measures to prepare to meet the DNA evidence presented by state. *Id.* As the trial court here pointed out, defense counsel in *Woodcox* had less time to prepare than Defendant did in this case.[4]

Considering the adequate amount of preparation available to Defendant, and applying our holding in *Woodcox*, we do not find that the trial court would have

4. The trial court found that Defendant had ample time to prepare for a DNA defense and/or cross-examination of the DNA expert. It further found that because Defendant was aware that the State might use DNA evidence at trial as early as May, Defendant should have initiated the search for a DNA expert then. Further, Defendant knew nineteen days in advance of trial that Smrz was to testify yet failed to make an attempt to interview or depose her. Additionally, the State readily informed Defendant of the DNA expert's conclusions and test results as soon as they were received—eleven days before trial.

sustained defense counsel's objection had he objected to the DNA expert's testimony at trial. Because Defendant failed to establish that his objection would have been sustained, his ineffective assistance of counsel claim fails.

## II

Defendant also contends that the trial court erroneously admitted DNA evidence contained in State Exhibit 40. This exhibit contained blood samples taken from both Defendant and the victim. Defendant objected to their admission at trial on the grounds that the requisite chain of custody was not established in several respects.

## A

Defendant first challenges the chain of custody within the FBI laboratory. At trial, he objected to the admission of the evidence because the State failed to show that the exhibit arrived at the FBI laboratory and passed through the hands of FBI agents in an undisturbed condition. He alleges that because the FBI clerk who received the evidence package failed to testify at trial, there was a fatal gap in the chain of custody.

■ It is well established in Indiana that an exhibit is admissible if the evidence regarding its chain of custody strongly suggests the exact whereabouts of the evidence at all times. *See Robinett v. State,* 563 N.E.2d 97, 100 (Ind.1990), *reh'g denied; Jones v. State,* 425 N.E.2d 128, 132 (Ind.1981). That is, in substantiating a chain of custody, the State must give reasonable assurances that the property passed through various hands in an undisturbed condition. *See Cliver v. State,* 666 N.E.2d 59, 63 (Ind.1996), *reh'g denied; Kennedy v. State,* 578 N.E.2d 633, 639 (Ind.1991), *cert. denied,* 503 U.S. 921, 112 S.Ct. 1299, 117 L.Ed.2d 521 (1992). We have also held that the State need not establish a perfect chain of custody whereby any gaps go to the weight of the evidence and not to admissibility. *See Wrinkles v. State,* 690 N.E.2d 1156, 1160 (Ind.

1997) *cert. denied,* 525 U.S. 861, 119 S.Ct. 148, 142 L.Ed.2d 121 (1998); *Kennedy,* 578 N.E.2d at 639.

■ FBI agent Melissa Smrz, a forensic DNA and serology examiner, testified as to the standard protocol employed in the receipt of evidence within the FBI laboratory. After receiving an evidence package in the FBI control room, a clerk opens and retrieves corresponding paperwork and delivers the evidence package to the assigned analysis unit. Should the evidence package arrive damaged or otherwise compromised, the clerk would so note; protocol does not require a similar notation for an undamaged package. Smrz further testified that Allen Justice received the evidence package into Smrz's unit and refrigerated it. Later in the day, Smrz removed the evidence package from the refrigerator and inventoried its contents. All items of evidence remained separately marked and sealed in containers with no apparent indication of tampering.

We find that the State established a continuous chain of custody for the serological evidence within the FBI laboratory without requiring additional testimony from the receiving clerk. Smrz sufficiently established the protocol employed by the control room in receiving evidence packages. We have held that [t]here is a presumption of regularity in the handling of exhibits by public officers, and a presumption that public officers discharge their duties with due care. *Kennedy,* 578 N.E.2d at 639 (holding that although the defendant challenged the exchange of evidence within the FBI laboratory, the FBI's customary procedures of handling exhibits sufficiently established a proper chain of custody); *Cliver,* 666 N.E.2d at 63. Further, Smrz testified that the samples were contained in a marked and sealed box that was intact at the time she examined and tested the evidence. Such a "marked-sealed procedure" employed by FBI officials demonstrates sufficient precaution against tampering. *See Hughett v.*

*State,* 557 N.E.2d 1015, 1019 (Ind.1990) (citing *Schlabach v. State,* 459 N.E.2d 740 (Ind.Ct.App.1984)).

We are satisfied that the State provided reasonable assurances that the exhibit moved through the hands of the FBI officials in an undisturbed condition.

**B**

Defendant next contends that the blood samples taken from the *victim* should not have been admitted because the State failed to establish a link between the seizure of the specimen and its whereabouts prior to its storage at police headquarters. Defendant makes this claim on appeal only. At trial, Defendant only objected to the handling of the blood samples within the FBI laboratory. Defendant argues should this Court consider this issue waived, the trial court committed fundamental error in admitting the evidence. Combined with Defendant's contention of fundamental error is the contention that Defendant's counsel was ineffective for failing to object to the admission of the blood evidence.

■ However, the record does not support Defendants claim that the State failed to establish a continuous chain of custody for the victim's blood sample. Detective Steven Lewis testified that he was present when the blood was drawn from the victim during the autopsy. Detective Lewis then secured the blood samples and transported them to City Hall where he refrigerated them. He further testified that the evidence remained in his possession unaltered until he mailed the sample to the FBI. Detective Lewis' testimony strongly suggests the whereabouts of the serological evidence at all times. The record adequately establishes the chain of custody with respect to this claim. There was no error, fundamental or otherwise. Similar-

ly, Defendant's ineffective assistance of counsel claim fails.[5]

**C**

Defendant similarly contends that the State failed to establish a sufficient chain of custody from the time *his blood* was seized to the time it was received by police officials. Again, Defendant failed at trial to object on these grounds, and so again asserts a claim of fundamental error and ineffective assistance of counsel.

**C–1**

Here, unlike our previous discussion regarding the extraction of the victim's blood, we find the gaps in the chain of custody troubling. "[F]ungible evidence, such as blood samples, requires a more stringent foundation. The State bears an enhanced burden of showing the continuous whereabouts of the evidence." *Wrinkles,* 690 N.E.2d at 1160–61 (citing *Hughett,* 557 N.E.2d at 1019). Here, the State failed to sustain this enhanced burden.

Although Detective Lewis testified that he was present for the withdrawal of the victim's blood, no such testimony was elicited to support a similar chain of custody for Defendant's blood samples. The record only supports the transfer of Defendant's blood samples from Sheriff Gossett to Detective Lewis. The record is silent as to the presence of an official at the time Defendant's blood was drawn.

■ We have previously held that it is incumbent upon the State to present evidence of the physician, nurse or someone in authority who was present at the taking of the blood establishing a chain of custody of the specimen to the laboratory where the testing is conducted. *See Baker v. State,* 449 N.E.2d 1085, 1087 (Ind.1983) (citing *Rinard v. State,* 265 Ind. 56, 351 N.E.2d 20 (1976)). *Accord Robinett,* 563

**5.** As we noted in our discussion *supra,* to maintain a claim of ineffective assistance of counsel, a defendant must demonstrate that the trial court would have sustained the objection had defense counsel objected at trial.

*See Lowery,* 640 N.E.2d at 1042. Because we find that the record does not support Defendant's claim, we see no reason why the trial court would have sustained this objection.

N.E.2d at 100. Such a stringent chain of custody for serological evidence allows a trial court to conclude that the specimen tested was indeed taken from the defendant. *See Baker,* 449 N.E.2d at 1087. Because the State failed to present evidence establishing that this indeed was the blood drawn from Defendant, we find that had Defendant objected to the admission of this evidence, the objection would have been sustained. *Accord id.* at 1085 (holding that the trial court erroneously admitted serological evidence where the State attempted to establish its authenticity through hospital records instead of with the testimony of a person in authority present at the taking of the serological evidence); *cf. Wrinkles,* 690 N.E.2d at 1161 (holding that no break in the chain of custody of serological evidence occurred where an officer testified as to his presence during acquisition of serological evidence as well as its location thereafter); *Robinett,* 563 N.E.2d at 100 (ruling that no gaps in the chain of custody of serological evidence occurred where an officer was present when the blood was drawn and he testified as to its whereabouts thereafter).

■■■ However, we do not find that the admission of this evidence rises to the level necessary to satisfy the prejudice prong of *Strickland.* To meet this test, the defendant must show that the deficient performance was so prejudicial as to deny defendant a fair trial. *See Brown,* 698 N.E.2d at 1139–40. A defendant is denied a fair trial only when a conviction occurs as the result of a breakdown in the adversarial process rendering the trial result unreliable. *See Cooper v. State,* 687 N.E.2d 350, 353 (Ind.1997); *Marshall v. State,* 621 N.E.2d 308, 321 (Ind.1993).

■■■ The jury had overwhelming evidence to convict Defendant without the challenged serological evidence. Testimony of four separate witnesses placed Defendant at the crime scene. One of these witnesses, Stephen Gariepy gave a bare-

chested Defendant a plaid shirt and drove Defendant from the scene of the crime to Terre Haute. Defendant told him that he and a "friend" had been attacked by hitchhikers and he believed "they" killed his friend, so he needed a ride to the police station. However, once in the car, Defendant's pursuit of the nearest police station ceased. Gariepy had ample opportunity to observe and later positively identify Defendant.

After Gariepy left Defendant at a railroad crossing, Defendant apparently walked to his girlfriend's home where he arrived "nervous and scared." (R. at 695.) There he told his girlfriend that he had "done something bad" and for her to forget that he ever owned a black Adidas jacket. (R. at 696–97.) She also took notice of the large sum of money Defendant removed from his sweatpants.[6] Additionally, she observed that Defendant's sweatpants were covered with mud and that his thermal boxer shorts had red stains. These items of clothing were later located in Defendant's trash can at his apartment while the Adidas jacket was found near the crime scene. The DNA expert testified that the red stains on Defendant's clothing matched the victim's blood. In fact, the DNA expert testified that the probability that the victim was the contributor of this DNA to the exclusion of all others was approximately 37 million to one.

Finally, the ice pick removed from the victim's right eye was identified as one belonging to Defendant. Two other witnesses testified that on several occasions Defendant told them that should he get into another fight, he would use an ice pick as his weapon of choice making sure to stab his opponent in the eye.

Considering the overwhelming evidence of Defendant's guilt, independent of his blood samples, the harm or potential for harm was not so prejudicial as to deny Defendant a fair trial. Accordingly, De-

---

**6.** Horton's girlfriend testified that he had cashed his paycheck the day before.

fendant's ineffective assistance of counsel claim fails.

### C–2

Alternatively, Defendant seeks to avoid dismissal of this claim by asserting that admission of this evidence on the basis of a faulty chain of custody was fundamental error.

■■ Establishing a claim of fundamental error requires a showing of at least as much prejudice to the defendant as a claim of ineffective assistance of counsel. As such, a finding that Defendant was not denied the effective assistance of counsel also establishes that the alleged error was not so prejudicial as to constitute fundamental error.[7] That is the case here.

### III

Defendant next contends that the trial court erred in denying Defendant's tendered voluntary manslaughter instructions.

■■ When a defendant requests a lesser-included offense instruction, a trial court applies a three-part analysis: (1) determine whether the lesser-included offense is inherently included in the crime charged; if not, (2) determine whether the lesser-included offense is factually included in the crime charged; and, if either, (3) determine whether a serious evidentiary dispute exists whereby the jury could conclude that the lesser offense was committed but not the greater. *See Wright v. State*, 658 N.E.2d 563, 566–67 (Ind.1995). If the final step is reached and answered affirmatively, then the requested instruction for a lesser-included offense should be given. *See id.* Voluntary manslaughter is simply murder mitigated by evidence of "sudden heat." *See Griffin v. State*, 644 N.E.2d 561, 562 (Ind.1994). Because voluntary manslaughter is inherently included in a murder charge, we turn to step three of the *Wright* analysis to determine whether Defendant's instruction should have been given–that is, whether there was a serious evidentiary dispute as to the existence of the mitigating factor of sudden heat. *See Horan v. State*, 682 N.E.2d 502, 507 (Ind.1997) (ruling that voluntary manslaughter is a lesser-included offense of murder), *reh'g denied. Accord Earl v. State*, 715 N.E.2d 1265, 1267 (Ind.1999).

■■ To establish that a defendant acted in sudden heat, the defendant must show "sufficient provocation to engender … passion." *Johnson v. State*, 518 N.E.2d 1073, 1077 (Ind.1988). Sufficient provocation is demonstrated by emotions such as " 'anger, rage, sudden resentment, or terror that is sufficient to obscure the reason of an ordinary person, prevent deliberation and premeditation, and render the defendant incapable of cool reflection.' " *Horan*, 682 N.E.2d at 507 (internal quotations and citations omitted); *Stevens v. State*, 691 N.E.2d 412, 426 (Ind. 1997), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 550, 142 L.Ed.2d 457 (1998); *Wilson v. State*, 697 N.E.2d 466, 474 (Ind.1998), *reh'g denied*. Because the trial court made an explicit finding as to the absence of sudden heat,[8] we review its refusal of the tendered voluntary manslaughter instructions for an abuse of discretion. *See Brown v. State*, 703 N.E.2d 1010, 1019 (Ind.1998); *Charl-*

---

**7.** We have previously addressed this issue in *Rouster v. State*, 705 N.E.2d 999 (Ind.1999), *reh'g denied*. In *Rouster*, we first analyzed the defendant's alleged errors under the *Strickland* prejudice prong. We concluded that if the defendant was unable to satisfy this prejudice prong, he would similarly fail to satisfy the fundamental error standard. *Rouster*, 705 N.E.2d at 1008 n. 8.

**8.** The trial court concluded, "[V]oluntary manslaughter is warranted if there is an appreciable evidence of sudden heat. Here there is no evidence of it at all.... I'm assuming [Defendant's] defense was, that wasn't him, he wasn't there. There is just no evidence of sudden heat here, whatsoever, I don't think that under this particular situation, that voluntary manslaughter is an appropriate ... lesser included [instruction]...." (R. at 1327–28.) We further note, as did the trial court, that a voluntary manslaughter instruction would have been inconsistent with the defense theory that Defendant was simply not present.

*ton v. State,* 702 N.E.2d 1045, 1048 (Ind. 1998), *reh'g denied; Champlain v. State,* 681 N.E.2d 696, 700 (Ind.1997).

■■■ We affirm the trial court's ruling. Defendant points to evidence that he was angry with his girlfriend and her brother. We have consistently held that simply establishing that the defendant was "angry" does not, standing alone, show sudden heat; there must be evidence that someone provoked the defendant. *See Wilson,* 697 N.E.2d at 473; *Champlain,* 681 N.E.2d at 702 (citing *Matheney v. State,* 583 N.E.2d 1202, 1205 (Ind.), *cert. denied,* 504 U.S. 962, 112 S.Ct. 2320, 119 L.Ed.2d 238 (1992)). Defendant presented no evidence that he was angry with the victim nor did he present evidence that he was in some way provoked by the victim. The evidence Defendant singled out only described his state of mind and not provocation. *See Barker v. State,* 695 N.E.2d 925, 933 (Ind.1998) (holding that the evidence that the defendant slept very little in the days prior to the murders and was on "speed" immediately before the murders described defendant's state of mind and not provocation), *reh'g denied.*

Given the lack of evidence suggesting that Defendant acted in sudden heat, the trial court did not abuse its discretion by denying Defendant's tendered voluntary manslaughter instructions.

## IV

Defendant next contends that the trial court's sentencing statement was insufficient to justify an enhanced sentence.

■■■ In general, the legislature has prescribed standard sentences for each crime, allowing the sentencing court limited discretion to enhance each sentence to reflect aggravating circumstances or reduce the sentence to reflect mitigating circumstances. When the trial court imposes a sentence other than the presumptive sentence, this Court will examine the record to insure that the court explained its reasons for selecting the sentence it imposed. *See Archer v. State,* 689 N.E.2d 678, 683 (Ind.1997) (citing *Hammons v. State,* 493 N.E.2d 1250, 1254 (Ind.1986), *reh'g denied*), *reh'g denied.* The trial court's statement of reasons must include the following components: (1) identification of all significant aggravating and mitigating circumstances; (2) the specific facts and reasons that lead the court to find the existence of each such circumstance; and (3) an articulation demonstrating that the mitigating and aggravating circumstances have been evaluated and balanced in determining the sentence. *See Mitchem v. State,* 685 N.E.2d 671, 678 (Ind.1997) (citing *Jones v. State,* 675 N.E.2d 1084, 1086 (Ind.1996)).

With respect to aggravating circumstances, the trial court explicitly identified Defendant's criminal history and his need for correctional treatment that could best be provided by his commitment to a penal facility as aggravating circumstances.[9] Although not explicitly identified as an aggravating circumstance in the sentencing statement, the trial court also emphasized the particularly disturbing facts concerning the nature of the crime: "Not only did you stab this man twenty-eight times, but according to your own theory, you made sure he died by stabbing him in the eye. I can't imagine a more intentional murder, or a more brutal." (R. at 1352–53.) This demonstrates that the trial court also relied on the nature and circumstances of the crime as an aggravating circumstance to justify the enhanced sentence. *See* Ind. Code § 35–38–1–7.1(a)(2) (Supp.1996) (The nature and circumstances of a crime shall be considered in determining what sentence to impose.); *see also Miller v. State,* 720 N.E.2d 696, 706 (Ind.1999) (holding that the nature and circumstances of crime are used to justify enhanced sentence even

---

**9.** Defendant contends that the trial court used the absence of mitigating circumstances as an aggravating circumstance. (Br. of Appellant, at 32–33.) We find no support for this argument in the record.

**1072**

though they are not neatly packaged in the sentencing statement); *Taylor v. State,* 695 N.E.2d 117, 120 (Ind.1998) (recognizing that a court considers the nature and circumstances of a crime to determine what sentence to impose); *Scheckel v. State,* 620 N.E.2d 681, 684 (Ind.1993) (considering particular heinous nature and circumstances of the crime as aggravating circumstances). The trial court identified no mitigating circumstances. Although we find that the trial court's application of one aggravating factor was improper, the remaining aggravating circumstances serve to justify an enhanced sentence.

■ The trial court did improperly invoke the correctional and rehabilitative treatment aggravating circumstance. *See* Ind.Code § 35–38–1–7.1(b)(3) (Supp.1996). We have consistently held that "for this aggravating circumstance to justify in part an enhanced sentence, it must be understood to mean that the defendant is in need of correctional and rehabilitative treatment that can best be provided by a period of incarceration in a penal facility in excess of the presumptive sentence term." *Mayberry v. State,* 670 N.E.2d 1262, 1271 (Ind.1996), *reh'g denied; Taylor,* 695 N.E.2d at 122. Here, however, the trial court did not articulate how such rehabilitation could be achieved through imposition of an enhanced sentence rather than the presumptive sentence. As such, we conclude that the trial court improperly applied this aggravating circumstance.

■ This discrepancy notwithstanding, the propriety of Defendant's sentence remains intact. Defendant incorrectly states that a trial court cannot rely solely on a defendant's criminal history when determining what sentence to impose. We have consistently held that a defendant's history of criminal activity is sufficient to support an enhanced sentence. *See* Ind. Code § 35–38–1–7.1(b)(2) (Supp.1996) (A person's criminal history may be used to support the finding of an aggravating circumstance to enhance a sentence.); *Porter v. State,* 715 N.E.2d 868, 872 (Ind.1999);

*Ellis v. State,* 707 N.E.2d 797, 804 (Ind. 1999). Additionally, we find that the court considered the nature and circumstances of the crime as an aggravating circumstance to justify the imposition of an enhanced sentence.

The trial court sufficiently demonstrated that it had engaged in an evaluative process of the sort necessary for meaningful appellate review. Accordingly, we affirm the trial court's imposition of the enhanced sentence.

*Conclusion*

We affirm the judgment of the trial court.

SHEPARD, C.J., and DICKSON, BOEHM, and RUCKER, JJ., concur.