

FILED

Aug 22 2023, 8:47 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Matthew J. McGovern
Fishers, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Nicole D. Wiggins
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Gareth Sylvester Earl Jones, *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, *Appellee-Plaintiff.* | August 22, 2023 <br><br> Court of Appeals Case No. 22A-CR-2661 <br><br> Appeal from the Clark Circuit Court <br><br> The Honorable Susan L. Orth, Judge Pro Tempore <br><br> Trial Court Cause No. 10C01-2103-F1-2 |

**Opinion by Judge Tavitas**
Judges Bailey and Kenworthy concur.

**Tavitas, Judge.**

## Case Summary

Gareth Jones was convicted of burglary resulting in serious bodily injury, a Level 1 felony, and robbery, a Level 5 felony. Jones appeals and claims that: (1) the trial court improperly admitted DNA evidence obtained from the victim's clothing; (2) the trial court improperly excluded the audio portion of a police body camera video; (3) the State failed to present sufficient evidence to support his convictions; and (4) his aggregate forty-year sentence is inappropriate. We disagree and, accordingly, affirm.

## Issues

Jones presents four issues, which we reorder and restate as:

    I.      Whether the trial court abused its discretion by admitting DNA evidence obtained from the victim's clothing due to the State's alleged failure to adequately establish the chain of custody.

    II.    Whether the trial court abused its discretion by excluding the audio portion of a police body camera video.

    III.   Whether the State presented sufficient evidence to support Jones's conviction for burglary resulting in serious bodily injury.

    IV.   Whether Jones's aggregate forty-year sentence is inappropriate.

## Facts

In the winter of 2019, then eighty-five-year-old M.B. lived in a ground-floor unit of an apartment complex for elderly residents in Clarksville, Indiana. M.B.'s

daughter, A.B., lived in a different unit of the same apartment complex. M.B.'s apartment was equipped with an emergency cord that could be pulled to summon assistance.

[4] On December 27, 2019, M.B. ate dinner with A.B. in M.B.'s apartment. At around 7:30 p.m., M.B. walked A.B. to her apartment and returned home. M.B. planned to see her grandchildren the next day, and she set out several Christmas bags containing gift cards. M.B. then sat in her chair and fell asleep while watching television.

[5] M.B. awoke to being attacked by a man she did not know. The man slammed M.B.'s head onto the floor and attempted to rip her clothes off. M.B. was able to pull the emergency cord during the attack. M.B.'s neighbors saw the emergency light activate in M.B.'s apartment and telephoned 911. The attacker fled at some later point.

[6] The Clarksville Fire Department arrived first on the scene, followed shortly by officers from the Clarksville Police Department ("CPD"). EMTs found a badly-injured M.B. lying on her kitchen floor and transported her to the hospital. CPD officers found M.B.'s apartment in disarray and observed blood on the carpeting. The sliding patio door was ajar. The police collected evidence from the apartment, which included M.B.'s bloody pajama pants and underwear that were lying on the floor. A trail of papers led from M.B.'s apartment to an outdoor dumpster; inside, the police found M.B.'s wallet.

Officers swabbed the wallet for DNA. M.B.'s purse and the gift cards for her grandchildren were missing and never recovered.

[7] At the hospital, M.B. was treated for a crushed orbital bone, broken wrist, broken nose, and two broken vertebrae. The clothing M.B. was wearing when she arrived at the hospital—a robe and a bed sheet—were taken by unknown hospital personnel and placed in a large zip-top plastic bag. Around one hour after the attack, CPD Detective Captain Raymond Hall interviewed M.B. Captain Hall took the bag containing M.B.'s clothing and placed it in his locked office. Two days later, Captain Hall logged the clothing into the CPD's evidence room.

[8] The police sent the DNA sample obtained from M.B.'s wallet to the Indiana State Police Laboratory. The police also obtained DNA samples from three suspects—none of whom were Jones. The DNA found on the wallet did not match these suspects, and the case went cold.

[9] Then, in early 2021, Captain Hall received information suggesting that Jones was involved in the attack on M.B. Although Jones lived in nearby Louisville, Kentucky, he worked in Clarksville in late 2019 and early 2020 and often spent the night with a friend who lived in Clarksville. Jones also often walked past M.B.'s apartment on his way to work. Captain Hall obtained a warrant to obtain a DNA sample from Jones. Jones, however, could not be located, and the warrant expired.

[10] On March 16, 2021, Captain Hall located Jones and, after informing Jones of his *Miranda* rights, interviewed him. Jones acknowledged working in Clarksville at the time of the attack, but he denied being involved. Jones voluntarily submitted to a DNA swab. The next month, the police sent M.B.'s robe and pajamas to the State Police Laboratory for DNA testing. The police also submitted Jones's DNA sample for comparison. Indiana State Police Laboratory Forensic Biologist Lyndsey Skipton received the swab from the wallet and the bag containing the robe and sheet. She took fabric samples from the items and tested them for bodily fluids. The DNA on the wallet and robe matched Jones's DNA to an incredibly high degree of mathematical certainty.[1] The DNA found on the pajama pants matched Jones's DNA, but to a much lower degree of certainty—only twice as likely to have come from Jones than from an unknown, unrelated person.

[11] On March 4, 2021, the State charged Jones with Count I: burglary resulting in serious bodily injury, a Level 1 felony; Count II, robbery resulting in serious bodily injury, a Level 2 felony; Count III, battery resulting in serious bodily injury, a Level 5 felony; and Count IV, sexual battery, a Level 6 felony. A jury trial was held from April 19 through April 29, 2022. At trial, Jones's theory of the case was that the police conducted a shoddy investigation. Jones claimed that the police failed to properly ensure that the chain of custody of the

---

[1] The DNA found on the wallet was at least one trillion times more likely to have come from M.B. and Jones than from M.B. and an unknown person. The DNA found on the robe was twelve octillion times more likely to have come from Jones and M.B. than from M.B. and an unknown person.

evidence was maintained and that the police failed to adequately investigate the other suspects. When the State offered into evidence the bag of clothing taken from M.B. at the hospital, Jones objected on grounds that the State had failed to establish a sufficient chain of custody. The trial court overruled this objection.

[12] Jones sought to introduce body camera video from the officers at the scene, which depicted officers not wearing gloves, walking through the crime scene, and commenting on certain items without collecting them. The trial court excluded most of the audio from the body camera footage and ruled that the officers' comments were irrelevant. At the end of the trial, the jury found Jones guilty of Counts I, II, and III, but acquitted him of Count IV.

[13] The trial court held a sentencing hearing on October 12, 2022. M.B. testified that the attack left her with PTSD and that she now lived in constant fear. A.B. testified that her mother had been very active for her age before the attack but that she now lived in pain and in fear. Jones's mother testified at sentencing regarding abuse Jones suffered as a child at the hands of his father. Jones's girlfriend testified that Jones was the primary caregiver to their two children and had been a good father.

[14] The trial court found as aggravating the significant and long-term injuries M.B. suffered and M.B.'s advanced age. The trial court further found as moderately aggravating Jones's criminal history consisting of two prior misdemeanor theft convictions. The court found as mitigating the abuse Jones suffered as a child, the hardship incarceration would impose on his children, and Jones's lack of

substance abuse. Ultimately, the trial court concluded that the aggravators of M.B.'s age and the severity of her injuries "far outweigh[ed]" the mitigating factors. Tr. Vol. VII p. 4. Due to double jeopardy concerns, the trial court vacated Jones's battery conviction and reduced the robbery conviction to a Level 5 felony. The court imposed a sentence of forty years on Count I and a concurrent sentence of six years on Count II. Jones now appeals.

## Discussion and Decision

### I. *Admission of Evidence*

[15] Jones argues that the trial court improperly admitted DNA evidence found on M.B.'s clothes, which were placed in a plastic bag by hospital staff and later obtained by the police from the hospital. We review challenges to the admission of evidence for an abuse of the trial court's discretion. *Combs v. State*, 168 N.E.3d 985, 990 (Ind. 2021). We will reverse only where the decision is clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights. *Clark v. State*, 994 N.E.2d 252, 259-60 (Ind. 2013).

[16] Jones argues that the evidence obtained from the clothing in the bag should have been excluded because the State failed to properly establish the chain of custody. An exhibit is admissible "if the evidence regarding its chain of custody strongly suggests the exact whereabouts of the evidence at all times." *Culver v. State*, 727 N.E.2d 1062, 1067 (Ind. 2000). The State must give "reasonable assurances that the property passed through various hands in an undisturbed

condition." *Id*. The State need not establish a perfect chain of custody, and any gaps in the chain go to the weight of the evidence and not to its admissibility. *Id*. There is a presumption of regularity in the handling of exhibits by public officers. *Id*. Merely raising the possibility of tampering is insufficient to make a successful challenge to the chain of custody. *Troxell v. State*, 778 N.E.2d 811, 814 (Ind. 2002).

[17] Jones first claims that the items in the bag were fungible. "The State bears a higher burden to establish the chain of custody of 'fungible' evidence, such as blood and hair samples, whose appearance is indistinguishable to the naked eye." *Id*. (citing *Culver v. State*, 727 N.E.2d 1062, 1068 (Ind. 2000); *Bivins v. State*, 433 N.E.2d 387, 389 (Ind. 1982)). The items in the bag—a robe and a bed sheet—were not indistinguishable to the naked eye. In fact, Captain Hall testified that the items in the bag were the same items he recovered at the hospital. Thus, these items were not fungible. We acknowledge, however, that the DNA itself, when removed from the clothing, is fungible. Indeed, DNA is normally invisible and, therefore, indistinguishable to the naked eye.

[18] Here, however, the State met its higher burden of establishing the chain of custody of the fungible DNA samples collected from the items in the bag. Captain Hall testified that the items in the bag were the same robe and sheet that M.B. was wearing at the crime scene, and he received the bag from hospital personnel approximately one hour after the attack. This bag was then locked in Hall's office and the evidence room until it was sent to the State Police Laboratory. Skipton testified regarding the chain of custody of the items in the

bag once they were received at the laboratory, and the laboratory's Chain of Custody Report was admitted into evidence; this report documented who had access to the evidence and when they had such access at the laboratory during every stage of the testing. Ex. Vol. VIII pp. 94-95. This sufficiently established the chain of custody of the fungible DNA found on the items in the bag.

[19] Jones notes that unknown hospital personnel removed M.B.'s clothes and placed them and the bed sheet in the plastic bag before Captain Hall took possession of the bag. Jones complains that the hospital personnel who placed M.B.'s clothing in the bag did not testify about how these items were collected. Our Supreme Court has long held, however, that a chain-of-custody foundation is not required for the period **before** the evidence comes into the possession of the police. *Arnold v. State*, 436 N.E.2d 288, 291 (Ind. 1982); *see also Cliver v. State*, 666 N.E.2d 59, 63 (Ind. 1996) ("The purpose of the chain of custody requirement is to demonstrate the continuous whereabouts of an exhibit **from the time it comes into the possession of the police** until the time it is presented at trial."). Thus, the State was not required to present evidence about what happened to the bag of clothing before Captain Hall took possession of it. *See Howard v. State*, 433 N.E.2d 753, 757 (Ind. 1982) (holding that the State did not have to establish the whereabouts of a paper bag recovered by a security guard before police obtained possession of the bag).

[20] Jones, though, argues that the medical personnel were acting as agents of the State and that the individual who collected the clothes and bed sheet and placed them in the bag should have testified to establish the whereabouts of the items

in the bag before given to the police. In support of this argument, Jones cites *Gibson v. State*, 518 N.E.2d 1132, 1135 (Ind. Ct. App. 1985). In that case, the defendant was involved in a car crash and smelled of alcohol. When the defendant was taken to the hospital, a police officer asked hospital personnel to obtain a blood sample from the defendant. On appeal from his conviction for operating a vehicle while intoxicated, the defendant argued that the State failed to properly establish the chain of custody for the blood sample. This Court disagreed and noted that "every person who handled the blood vial from the time [the nurse] drew the sample from Gibson's arm through the time [the lab analyst] performed the BAC testified that the vial was not tampered with while it was in his or her possession." *Id*. at 1136.

[21] From this, Jones concludes that the *Gibson* court "likely found medical personnel necessary witnesses to establish a chain of custody because they were involved with law enforcement and the investigation of the crime." Appellant's Br. pp. 30-31. This reads too much into our opinion in *Gibson*. Nothing in *Gibson* suggests the court concluded that the nurse was an agent of the State. The court was merely noting that there were simply no gaps in the chain of custody, even before the blood sample came into possession of the police. *See id.* at 1136 ("[I]ndeed, it is difficult for us to conceive of facts which would forge a stronger chain.").[2]

---

[2] Jones also cites *Gardner v. State*, 306 S.W.3d 274 (Tex. Crim. App. 2009). Of course, this case is not binding on us. Moreover, we do not read *Gardner* as supporting Jones's argument. In *Gardner*, the court merely

[22]    We reject Jones's claim that law enforcement officers were in possession of the robe at the crime scene because M.B. was wearing the robe at the apartment when the officers first spoke with her. Clearly, the robe was in the possession of M.B. at the time—not the police. Jones also complains that the police "allowed" M.B. to leave the scene accompanied only by a paramedic rather than ensuring the integrity of the chain of custody. This argument borders on the absurd. The concern of the police and EMTs at the time was to rush a severely injured eighty-five-year-old woman to the hospital. We cannot fault the officers for not sending a police escort to guard M.B.'s robe.

[23]    Despite his claims to the contrary, Jones can only assert the possibility that the robe was tampered with in the approximately one-hour period before Captain Hall took possession of it. This is not enough to exclude evidence on chain-of-custody grounds. *See Troxell*, 778 N.E.2d at 815 (rejecting defendant's claim that State failed to establish proper chain of custody of defendant's DNA sample where defendant only pointed to the possibility that the sample may have been subject to tampering and pointed to no evidence to support his allegation). Accordingly, the trial court did not abuse its discretion by admitting these items and the evidence obtained from these items.

---

noted that the chain of custody of a robe worn by a murder victim was established by the paramedic who testified at trial that she took the robe off the victim. *Id.* at 293. But this does not mean that the chain of custody would not have been established had the paramedic not testified.

## II. *Exclusion of Audio Portions of Body Camera Video*

Jones also argues that the trial court abused its discretion by excluding the audio of the police body camera footage taken at the crime scene while the officers collected evidence. Our trial courts have considerable discretion regarding the exclusion of evidence. *Dunn v. State*, 202 N.E.3d 1158, 1162 (Ind. Ct. App. 2022) (citing *Clark*, 994 N.E.2d at 259-60), *trans. denied*. We review the trial court's decision only for an abuse of that discretion. *Clark*, 994 N.E.2d at 260.

At issue here is the video obtained from the body cameras worn by Captain Hall and another officer as they walked through M.B.'s apartment. Jones claims that the audio portions of the footage were important to provide context to the video portions because the body camera recorded the officers commenting on items of potential evidentiary value without collecting them. Given his theory of a shoddy investigation, Jones claims that the audio contained "additional damning details," such as the officers commenting on shoes at the scene, which the police failed to collect as evidence; disregarding evidence of an overturned lamp and commenting that the apartment did not look as if a burglary had taken place; and commenting that there was nothing of evidentiary value in a portion of the apartment. Appellant's Br. p. 41. Jones claims that the audio containing these comments was relevant and vital to his theory that the police conducted a shoddy investigation. The State counters that the trial court properly excluded these items because they were irrelevant and inadmissible hearsay.

[26]     Even if we assume that the audio portions of the body camera footage should have been admitted into evidence, we conclude that any error was harmless. An error in the admission or exclusion of evidence will be found to be harmless "'if its probable impact on the jury, in light of all the evidence in the case, is sufficiently minor so as not to affect the substantial rights of the parties.'" *Stewart v. State*, 167 N.E.3d 367, 375 (Ind. Ct. App. 2021) (citing *Caesar v. State*, 139 N.E.3d 289, 292 (Ind. Ct. App. 2020), *trans. denied*), *trans. denied*; *see also* Ind. Appellate Rule 66(A).

[27]     Here, the video footage from the body cameras was admitted, which showed the actions of the police at M.B.'s apartment, and Jones's counsel vigorously cross-examined the police about their alleged failures during the investigation. The State's evidence included the fact that Jones worked in the area of the attack and often walked by M.B's apartment on his way to work. More importantly, Jones's DNA was found on the victim's robe and her wallet. Given this strong evidence of Jones's guilt, the exclusion of the audio portions of the body camera video was, at most, harmless error.

### III. Sufficiency of the Evidence

[28]     Jones also argues that the State failed to present sufficient evidence to support his convictions. "Claims of insufficient evidence 'warrant a deferential standard, in which we neither reweigh the evidence nor judge witness credibility.'" *Stubbers v. State*, 190 N.E.3d 424, 429 (Ind. Ct. App. 2022) (quoting *Powell v. State*, 151 N.E.3d 256, 262 (Ind. 2020)), *trans. denied*. On appeal, "[w]e consider only the evidence supporting the judgment and any

reasonable inferences drawn from that evidence." *Id*. (citing *Powell*, 151 N.E.3d at 262). "'We will affirm a conviction if there is substantial evidence of probative value that would lead a reasonable trier of fact to conclude that the defendant was guilty beyond a reasonable doubt,'" and we will affirm a conviction "'unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt." *Id*. (citing *Powell*, 151 N.E.3d at 262). Thus, it is not necessary that the evidence overcome every reasonable hypothesis of innocence; instead, the evidence is sufficient if an inference may reasonably be drawn from it to support the verdict. *Id*. (citing *Drane v. State*, 867 N.E.2d 144, 146-47 (Ind. 2007); *Sutton v. State*, 167 N.E.3d 800, 801 (Ind. Ct. App. 2021)).

[29]   Jones claims that there was insufficient evidence showing that he was the person who broke into M.B.'s home and attacked her. M.B. could not identify her attacker.[3] Other evidence, however, supports the jury's conclusion that Jones was M.B.'s assailant. Jones worked in Clarksville and often walked by the apartment where M.B. lived. Jones's DNA was found on M.B.'s robe and on the wallet found in the dumpster outside M.B.'s apartment. DNA that matched Jones's DNA, albeit with a much lower degree of confidence, was

---

[3] There was evidence that M.B. described her assailant as a white male. *See* Tr. Vol. IV p. 79 (CPD Officer Justice Kraft testifying that M.B. told him that she saw someone, "possibly a white male," messing with her back door when M.B. had dinner with her daughter before the attack); Tr. Vol. V p. 103 (Captain Hall testified that M.B. described her attacker as a "possible white male."). Jones is a black man. Appellant's App. Vol. III p. 41.

found on M.B.'s pajama pants. From this evidence, the jury could reasonably conclude that Jones was M.B.'s attacker.

[30] We find this case to be distinguishable from *Marrow v. State*, 699 N.E.2d 675 (Ind. Ct. App. 1998), cited by Jones. In that case, someone broke into a shed and stole some tools. A set of keys belonging to the defendant were found inside the shed. Based on this evidence, the defendant was convicted of burglary and theft. On appeal, a panel of this Court concluded that this evidence was insufficient to identify the defendant as the perpetrator and noted that, unlike fingerprints, "keys are personal property which can be possessed and left at a crime scene by someone other than the owner." *Id*. at 677. Here, however, the police did not find Jones's keys at the scene; they found his DNA, which is a biological fingerprint rather than an inanimate item of personal property.

[31] Jones also cites *Meehan v. State*, 7 N.E.3d 255 (Ind. 2014), in support of his claim that the DNA found on the items at or near the crime scene was not, by itself, sufficient to support a conclusion that he was the perpetrator. In *Meehan*, a glove containing the defendant's DNA was found inside the burglarized building. When Meehan was arrested, he possessed bolt cutters, a pocketknife, a screwdriver, a chisel, and two Allen key sets. On appeal, Meehan argued that the evidence was insufficient to identify him as the burglar, specifically arguing that "a glove is 'an item easily lost, found, borrowed or stolen.'" *Id*. at 258 (record citation omitted).

[32]     Our Supreme Court noted that, although the glove containing the DNA was the only evidence that directly connected Meehan to the burglary, "the glove itself, and Meehan's possession of tools potentially used to commit burglary are probative evidence from which an inference reasonably tending to support the guilty verdict could have been drawn." *Id*. The Court also noted that the glove was discovered near the damaged door and that the jury could have inferred that the glove was dropped by Meehan on entering or exiting the building. *Id*. "Moreover, there was no more obvious explanation for the glove's presence at the scene," and the glove had not been in the building the night before. *Id*. The Court also rejected Meehan's argument that his DNA could have easily been transferred to another person's glove by casual touching. *Id*. at 259. Although recognizing this was possible, the Court concluded that "[t]he existence of the possibility of being 'framed' does not amount to a lack of substantial evidence of probative value from which the jury could reasonably infer that Meehan committed the burglary." *Id*.

[33]     Jones claims that, unlike in *Meehan*, no other evidence connects him to the burglary and attack on M.B. We do not read *Meehan* as holding that the defendant's DNA on an item found at the crime scene is, by itself, insufficient to establish that the defendant was the perpetrator. Although there was additional evidence in *Meehan*—the possession of tools—the absence of such evidence does not mean that the DNA evidence alone cannot establish the identity of the perpetrator. Additionally, here, the DNA was not found on a

glove that can be easily dropped; instead, it was found on the victim's clothing and her wallet.

[34] Jones claims that his DNA could have been present due to his job working for UPS. Even if we were to agree that this was possible, precisely how Jones's DNA ended up on M.B.'s robe and wallet was a question of fact for the jury to determine, and we will not second-guess the jury's factual determinations on appeal. Jones also worked in the area of M.B.'s apartment and often walked past the apartment complex. Given this evidence, the jury could reasonably conclude that Jones was the person who broke into M.B.'s apartment and attacked her.

## IV. Sentencing

[35] Lastly, Jones claims that the forty-year aggregate sentence imposed by the trial court was inappropriate. The Indiana Constitution authorizes independent appellate review and revision of a trial court's sentencing decision. *Jackson v. State*, 145 N.E.3d 783, 784 (Ind. 2020) (citing Ind. Const. art. 7, §§ 4, 6; *McCain v. State*, 88 N.E.3d 1066, 1067 (Ind. 2018)). Our Supreme Court has implemented this authority through Indiana Appellate Rule 7(B), which allows this Court to revise a sentence when it is "inappropriate in light of the nature of the offense and the character of the offender."[4] Our review of a sentence under

---

[4] Though we must consider both the nature of the offense and the character of the offender, an appellant need not prove that each prong independently renders a sentence inappropriate. *See, e.g., State v. Stidham*, 157 N.E.3d 1185, 1195 (Ind. 2020) (granting a sentence reduction based solely on an analysis of aspects of the defendant's character); *Connor v. State*, 58 N.E.3d 215, 219 (Ind. Ct. App. 2016) (holding that Appellate Rule

Appellate Rule 7(B) is not an act of second guessing the trial court's sentence; rather, "[o]ur posture on appeal is [] deferential" to the trial court. *Bowman v. State*, 51 N.E.3d 1174, 1181 (Ind. 2016) (citing *Rice v. State*, 6 N.E.3d 940, 946 (Ind. 2014)). We exercise our authority under Appellate Rule 7(B) only in "exceptional cases, and its exercise 'boils down to our collective sense of what is appropriate.'" *Mullins v. State*, 148 N.E.3d 986, 987 (Ind. 2020) (per curiam) (quoting *Faith v. State*, 131 N.E.3d 158, 160 (Ind. 2019)).

[36] "'The principal role of appellate review is to attempt to leaven the outliers.'" *McCain*, 148 N.E.3d at 985 (quoting *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008)). The point is "not to achieve a perceived correct sentence." *Id.* (citing *Knapp v. State*, 9 N.E.3d 1274, 1292 (Ind. 2014)). "Whether a sentence should be deemed inappropriate 'turns on our sense of the culpability of the defendant, the severity of the crime, the damage done to others, and myriad other factors that come to light in a given case.'" Id. (quoting *Cardwell*, 895 N.E.2d at 1224). Deference to the trial court's sentence "should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)." *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015). When

7(B) provides that "the reviewing court must consider both of those prongs in our assessment, and not . . . that the defendant must necessarily prove each of those prongs render his sentence inappropriate."); *see also* *Davis v. State*, 173 N.E.3d 700, 707-09 (Ind. Ct. App. 2021) (Tavitas, J., concurring in result) (disagreeing with majority's assertion that Appellate Rule 7(B) requires a criminal defendant to show that his sentence is inappropriate in light of both his character and the nature of the offense).

determining whether a sentence is inappropriate, the advisory sentence is the starting point the legislature has selected as an appropriate sentence for the crime committed. *Fuller v. State*, 9 N.E.3d 653, 657 (Ind. 2014).

[37] Here, Jones was convicted of burglary resulting in serious bodily injury, a Level 1 felony, and robbery, a Level 5 felony. Subject to certain exceptions not relevant here, "a person who commits a Level 1 felony . . . shall be imprisoned for a fixed term of between twenty (20) and forty (40) years, with the advisory sentence being thirty (30) years." Ind. Code § 35-50-2-4(b). "A person who commits a Level 5 felony . . . shall be imprisoned for a fixed term of between one (1) and six (6) years, with the advisory sentence being three (3) years." Ind. Code § 35-50-2-6. The trial court sentenced Jones to forty years on the Level 1 felony conviction and a concurrent term of six years on the Level 5 felony conviction.

[38] Jones claims that the trial court sentenced him to the maximum sentence. It is true that the trial court imposed the maximum sentences on both convictions, but the trial court also ordered the sentences to be served concurrently. Thus, Jones was facing a maximum sentence of forty-six years, but the trial court imposed an aggregate sentence six years less than the maximum possible sentence. In considering whether a sentence is inappropriate, "we 'focus on the forest—the aggregate sentence—rather than the trees—consecutive or concurrent, number of counts, or length of the sentence on any individual count.'" *Brown v. State*, 10 N.E.3d 1, 8 (Ind. 2014) (citing *Cardwell*, 895 N.E.2d

at 1225)). Thus, in considering whether Jones's sentence is inappropriate, we recognize that he did not receive the maximum possible sentence.

## A. Nature of the Offense

[39] Our analysis of the nature of the offense requires us to look at the nature, extent, heinousness, and brutality of the offense. *Brown*, 10 N.E.3d at 5. Here, the nature of the offense was particularly odious. Jones broke into the home of and brutally attacked an eighty-five-year-old woman while she slept so that he could rob her of Christmas gifts she purchased for her grandchildren. The photos of M.B.'s injuries document the seriousness of the injuries she suffered, which included a crushed orbital bone, a fractured wrist, a fractured nose, and fractured vertebrae.[5] Jones also ripped M.B.'s clothes off. M.B. continues to suffer physically as a result of her injuries: she can no longer read or sew, and she continues to have pain in her back and a lack of strength in her arm. She also suffers from PTSD as a result of the attack and no longer travels or drives due to fear. The circumstances of Jones's crimes demonstrate no restraint,

---

[5] Jones briefly claims that the trial court abused its sentencing discretion by considering the seriousness of M.B.'s injuries as an aggravating factor because his conviction was already elevated based on the serious bodily injury M.B. suffered. Our Supreme Court has held that "'[w]here a trial court's reason for imposing a sentence greater than the advisory sentence includes material elements of the offense, absent something unique about the circumstances that would justify deviating from the advisory sentence, that reason is improper as a matter of law.'" *Phipps v. State*, 90 N.E.3d 1190, 1197 (Ind. 2018) (quoting *Gomillia v. State*, 13 N.E.3d 846, 852-53 (Ind. 2014)). Here, the trial court did not identify M.B.'s serious injuries, by themselves, as aggravating. Instead, the trial court noted that there was no reason for Jones to attack M.B. if he merely wanted to steal her belongings. The trial court also noted that M.B. has continuing physical ailments as a result of her injuries. In other words, the trial court considered the particular nature and circumstances of the crime—including M.B.'s advanced age—as aggravating, not merely the fact that she suffered serious bodily injury. Thus, the trial court did not abuse its discretion by considering these circumstances as aggravating.

regard, or lack of brutality, or any other circumstances that would portray Jones's offenses in a positive light.

## B. *Character of the Offender*

[40] Our analysis of the character of the offender involves a broad consideration of a defendant's qualities, including: the defendant's age, criminal history, background, past rehabilitative efforts, and remorse. *Harris v. State*, 165 N.E.3d 91, 100 (Ind. 2021); *McCain v. State*, 148 N.E.3d 977, 985 (Ind. 2020). The significance of a criminal history in assessing a defendant's character and an appropriate sentence varies based on the gravity, nature, proximity, and number of prior offenses in relation to the current offense. *Sandleben v. State*, 29 N.E.3d 126, 137 (Ind. Ct. App. 2015) (citing *Bryant v. State*, 841 N.E.2d 1154, 1156 (Ind. 2006)), *trans. denied*.

[41] Jones notes that he has only two prior misdemeanor convictions: one for criminal mischief in Ohio in 2014 and one for Class A misdemeanor theft in Indiana in 2016. Although this is not a significant criminal history, it still reflects poorly on Jones's character. "Even a minor criminal history is a poor reflection of a defendant's character." *Prince v. State*, 148 N.E.3d 1171, 1174 (Ind. Ct. App. 2020) (citing *Moss v. State*, 13 N.E.3d 440, 448 (Ind. Ct. App. 2014), *trans. denied*). As noted by the State, both of Jones's prior convictions were property crimes, and Jones's crimes here appear to have been motivated by the desire to steal M.B.'s property. The trial court noted the escalating nature of Jones's crimes and found this to be moderately aggravating. We also note that Jones's girlfriend admitted that Jones "busted" her lip during an

argument, Tr. Vol. VI p. 226, resulting in a charge of Level 6 felony domestic battery in the presence of a child—a charge that was still pending at the time of sentencing.

[42] Jones also claims that he had a difficult childhood and that we should consider this when assessing his character. Our Supreme Court has "occasion[aly] . . . considered a defendant's traumatic youth in reducing a sentence. *Wright v. State*, 168 N.E.3d 244, 269 (Ind. 2021) (citing *Mullins v. State*, 148 N.E.3d 986, 987-88 (Ind. 2020) (per curiam)). "But more often than not, [our Supreme Court] ha[s] 'held that evidence of a difficult childhood is entitled to little, if any, mitigating weight.'" *Id.* (citing *Bethea v. State*, 983 N.E.2d 1134, 1141 (Ind. 2013)). Without any circumstances to suggest that Jones's difficult childhood was somehow related to his crimes here, we cannot say that his childhood supports a revision of his sentence. *See id*.

[43] Jones also notes that there was evidence that he was actively involved in his children's lives and that his incarceration will be difficult for them. Although Jones's involvement with his children is commendable, it does not persuade us that his sentence is inappropriate. Even a shorter term would cause similar hardship on his children. *See Weaver v. State*, 845 N.E.2d 1066, 1074 (Ind. Ct. App. 2006) (hardship to a defendant's dependents can be given little consideration when the defendant fails to show why incarceration for a particular term will cause more hardship than incarceration for a shorter term), *trans. denied*.

[44] Lastly, Jones claims that his gainful employment is evidence of his positive character. We have held before that most people are employed such that this consideration does not warrant a lesser sentence. *Pritcher v. State*, 208 N.E.3d 656, 669 (Ind. Ct. App. 2023) (citing *Hale v. State*, 128 N.E.3d 456, 465 (Ind. Ct. App. 2019)); *see also Holmes v. State*, 86 N.E.3d 394, 399 (Ind. Ct. App. 2017) (noting that gainful employment is not necessarily a mitigating factor).

[45] In short, Jones has not met his burden on appeal of showing that his forty-year sentence is inappropriate in light of the particularly brutal nature of his offense and his less-than-stellar character.

## Conclusion

[46] The trial court did not abuse its discretion by admitting the DNA evidence obtained from the victim's robe, and any error in excluding the audio portion of the police body camera footage was, at most, harmless. The State presented sufficient evidence to support Jones's convictions, and Jones's forty-year aggregate sentence is not inappropriate. Accordingly, we affirm the judgment of the trial court.

[47] Affirmed.

Bailey, J., and Kenworthy, J., concur.